1  IAN C. BALLON (SBN 141819)
   ballon@gtlaw.com
2  DAVID M. LISI (SBN 154926)
   lisid@gtlaw.com
3  CATHLEEN DONOHOE (SBN 228729)
   donohoec@gtlaw.com
4  **GREENBERG TRAURIG, LLP**
   1900 University Ave., 5th Floor
5  East Palo Alto, California 94303
   Telephone:  (650) 328-8500
6  Facsimile:  (650) 328-8508

7  Attorneys for Plaintiff,
   OPENWAVE MESSAGING INC.

8

9           **IN THE UNITED STATES DISTRICT COURT**

10         **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

11                    **SAN JOSE DIVISION**

12  OPENWAVE MESSAGING, INC., a          CASE NO. _____
    Delaware corporation,
13                                       **COMPLAINT FOR:**

14              Plaintiff,               **(1)  COPYRIGHT INFRINGEMENT**
                                         **(2)  FALSE ADVERTISING UNDER**
15  v.                                   **      15 U.S.C. § 1125**
                                         **(3)  MISAPPROPRIATION OF**
16                                       **      TRADE SECRETS UNDER CAL.**
                                         **      CODE CIV. PROC. § 3426**
17  OPEN-XCHANGE, INC., a Delaware       **(4)  BREACH OF CONTRACT**
    corporation,                         **(5)  BREACH OF THE IMPLIED**
18                                       **      COVENANT OF GOOD FAITH**
                                         **      AND FAIR DEALING**
19              Defendant.               **(6)  TORTIOUS INTERFERENCE**
                                         **      WITH CONTRACT**
20                                       **(7)  TORTIOUS INTERFERENCE**
                                         **      WITH PROSPECTIVE**
21                                       **      BUSINESS RELATIONSHIPS**
                                         **(8)  FALSE ADVERTISING UNDER**
22                                       **      CAL. BUS. & PROF. CODE**
                                         **      § 17500**
23                                       **(9)  UNFAIR COMPETITION**
                                         **      UNDER CAL. BUS. & PROF.**
24                                       **      CODE § 17200**
                                         **(10) COMMON LAW UNFAIR**
25                                       **      COMPETITION**
                                         **(11) FRAUD**
26

27                                       **DEMAND FOR JURY TRIAL**

28

                        COMPLAINT

Plaintiff Openwave Messaging, Inc. ("Openwave") for its Complaint against defendant Open-Xchange, Inc. ("OX"), alleges as follows:

## Introduction

1.     Openwave brings this action in response to OX's calculated campaign of misappropriation, infringement, deceit and unfair business practices, whereby OX has taken and continues to take unfair advantage of its business relationship with Openwave, has stolen Openwave's intellectual property and has misused its knowledge of confidential Openwave information.  As part of this ongoing unlawful activity, OX also has breached its written agreements with Openwave and engaged in a scheme to misappropriate and infringe upon Openwave's technology and know-how in order to compete with it unfairly in the marketplace and wrongfully interfere with Openwave's contracts and long-standing valuable customer relationships.

2.     All of these unlawful actions were performed by OX while it was purporting to act as a business partner to Openwave and while it was subject to contractual and good faith duties under a series of agreements with Openwave.

3.     Openwave has been in the messaging industry for nearly 30 years.  Over those years it developed a unique expertise in the design and implementation of email platforms for large companies, including some of the largest telecommunication companies in the world, many of which have been loyal customers of Openwave for decades.

4.     In 2011, Openwave and OX entered into a contract to use OX's email user interface as an element of the email system on certain of Openwave customer projects (the "OEM Agreement").  At that time, OX was a small German company providing its email interface software for small businesses, mainly in Europe.  In fact, OX was so small that, along with the OEM Agreement with Openwave, OX negotiated for a large cash prepayment from Openwave to fund its operations.  Without that cash infusion, it is unclear whether OX could have survived, let alone grown into the much larger company that it has become as a result of its relationship with Openwave.

5.     OX's theft of Openwave's trade secret and proprietary and confidential information was committed as part of a systematic, surreptitious and fraudulent plan by which OX insinuated itself into the relationship between Openwave and its customers in the guise of operating as Openwave's business

partner.  OX repeatedly represented its desire to serve as a willing partner to assist Openwave's operations and further assist with the development and implementation of additional collaborative platform products.  In fact, OX was pursuing a secret agenda – to gain access to Openwave's confidential information for the twin purposes of:  (1) enhancing its own email user interface using Openwave's hard-won know-how and (2) directly undermining and damaging Openwave's client relationships so that it eventually could replace Openwave's product offering with its own.  As a result of OX's fraudulent misrepresentations and intellectual property theft, OX was able to create competing products through affiliated companies and market them directly to Openwave's customers while it continued to pretend to work collaboratively with Openwave on projects for those very same customers. OX acted similarly with respect to Openwave's pitches for new business with new customers.

6. To gain even greater access to Openwave's confidential information, OX engaged in a series of fraudulent merger and acquisition discussions with Openwave.  It only was after Openwave allowed OX access to its most highly confidential technical information, business strategy information and trade secrets (under the protections of a nondisclosure agreement) that it became clear to Openwave that the entire merger/acquisition discussions were part of a fraud perpetrated by OX for the sole purpose of gaining this intimate access to Openwave's products, business strategies, personnel, and other proprietary information.

7. OX did not stop there.  In furtherance of its campaign to strip Openwave of its longtime loyal customers and to eliminate Openwave as a viable competitor in the marketplace, OX's tactics have included using highly publicized, but false and unsupported statements to customers and potential customers concerning Openwave and its business.  These statements include false claims that systems and software developed for and with Openwave pursuant to the OEM Agreement were in fact the property of OX and that Openwave's products are objectively defective.  OX intended that these unfair, untrue and deceptive statements would cause customers and potential customers of Openwave to re-evaluate their plans to retain or deploy Openwave products as the primary component of their email service system.

8. In addition, Openwave is informed and believes and on that basis alleges that OX has misappropriated several of Openwave's trade secrets, including customer lists, product pricing

information and contract terms, as well as system design details and specifications, with the express goal of undermining and destroying Openwave's customer relationships and unfairly diverting existing and potential future business to itself.

9.     As part of its strategy, OX also has unfairly and improperly solicited several of Openwave's employees throughout the world and has encouraged them to violate their contractual obligations to Openwave to protect its trade secrets and confidential and proprietary information as yet another avenue through which OX could unfairly compete in the marketplace against Openwave and steal Openwave's valuable intellectual property and customers.

10.     OX also has made various statements about Openwave that are objectively false, and are solely intended to create an atmosphere of fear, uncertainty and doubt about Openwave, its products, and personnel.  For example, OX failed to provide Openwave customers with satisfactory functional products as a result of the failings of OX's own email interface.  Despite its knowledge that there were numerous significant issues with the functionality of its product, OX misrepresented to customers that it was Openwave's platform that was the primary cause of any issues experienced during the product implementation and that OX could provide the requested email system, but only if the customers terminated their agreements with Openwave.

11.     Further, OX personnel made misrepresentations to several Openwave customers, potential customers and business partners that Openwave was experiencing such financial distress that it:  (1) had plans to exit the European marketplace, (2) was eliminating large numbers of employees, and (3) lacked the resources necessary to provide adequate support to its customers.  OX knew or should have known all of these statements to be false when it made them.

12.     In sum, OX's campaign against Openwave has been designed both to accelerate the growth of OX despite the objective shortcomings of its products, and to simultaneously damage Openwave's reputation with existing clients and in the marketplace.  These actions not only violate prohibitions against unfair competition under federal and state law, but also violate clear contractual obligations assumed by OX as a result of its agreements with Openwave to work cooperatively with it in the development and implementation of email systems for commercial enterprises.

13.     Absent legal redress, OX's fraudulent, illegal and reprehensible actions will irreparably

1  damage Openwave and its good reputation and cause irreparable damage to competition in the

2  marketplace for large-scale email systems, harming both Openwave and the public at large.

3  **Nature of the Action**

4  14.     Openwave seeks injunctive and monetary relief for acts of copyright infringement, trade

5  secret misappropriation, false advertising, and unfair competition.  Openwave additionally seeks

6  appropriate damages for OX's acts of fraud, breach of contract, breach of the covenant of good faith and

7  fair dealing, as well as for tortious interference with contract and prospective business relationships.

8  **The Parties**

9  15.     Openwave Messaging Inc. is a Delaware corporation with its principal place of business

10  in San Mateo, California.  Openwave Messaging Inc. is the successor-in-interest to Openwave Systems

11  Inc.

12  16.     On information and belief, Open-Xchange Inc. is a Delaware corporation with its

13  principal place of business in Nuremberg Germany and with an office located in Palo Alto, California.

14  **Jurisdiction and Venue**

15  17.     This action arises under the Copyright Act, 17 U.S.C. §§ 101 *et seq.,* the Lanham Act, 15

16  U.S.C. §§ 1051 *et seq.*; California's implementation of the Uniform Trade Secrets Act, Cal. Civ. Proc.

17  Code §§ 3426, *et seq.*; Cal. Bus. & Prof. Code §§ 17200, *et seq.*; Cal. Bus. & Prof. Code §§ 17500 *et*

18  *seq.*; and other laws of the State of California.

19  18.     The Court has jurisdiction under 28 U.S.C. §§ 1338(a) and 1367.

20  19.     Venue is proper within this judicial district under 28 U.S.C. § 1391(b).

21  20.     Jurisdiction and venue are also proper because in the June 30, 2011 OEM Agreement

22  between Openwave and OX, the parties agreed that any legal action or proceeding with respect to the

23  agreement would be brought in the U.S. District Court for the Northern District of California or any

24  state court located in the Northern District.

25  **Background Facts**

26  ***Openwave and Its Platform***

27  21.     Openwave is one of the largest and most successful global providers of software and

28  services for commercial email platforms.  Openwave markets and sells its products to large

5
COMPLAINT

telecommunications carriers and providers worldwide.  Historically, Openwave's business has been extremely successful.  Of the more than four billion email accounts in the world today, approximately 15% run on Openwave's email platform.

22.   One reason for Openwave's success is its focus on ongoing innovation and improvement to all aspects of its products and services.  An area that received particular attention from Openwave in recent years was Openwave's email user interface – essentially the aspect of Openwave's email system that customers actually see, and with which they interact on their computer screens.

23.   As a result of Openwave's efforts to improve its user interface and customer experience, Openwave began discussions with OX in 2010 to potentially package OX's email interface with the rest of Openwave's system.  At that time, OX's primary business was its email interface products and services, which were sold on a small scale with very little customization.

***OX Product and History***

24.   On information and belief, OX presently develops, markets and sells web-based communication, collaboration and office productivity software, enabling the integration of email, documents, scheduling and social media.  OX began as a Linux-based email and groupware solution that was positioned as an open source alternative to Microsoft Exchange.  Beginning in or about 2006, OX developed a scalable email product for hosted deployments.

***The OEM Agreement between Openwave and OX***

25.   In early 2011, Openwave determined that Openwave and OX could obtain substantial mutual benefits by licensing certain OX user interface products for use with Openwave's email platform products for email system implementation with third-party customers.

26.   After extensive negotiations, Openwave and OX entered into a series of agreements. First, Openwave and OX entered into a Mutual Confidentiality Agreement on or about March 23, 2011 (the "Mutual Confidentiality Agreement").

27.   Subsequently, Openwave and OX executed an OEM Agreement on or about June 30, 2011.  The OEM Agreement was subsequently amended by the parties on eight occasions – Amendment Nos. 1-8 – between August 19, 2011 and June 30, 2014. The purpose of the amendments was to revise certain language in the OEM Agreement (Amendment Nos. 1 and 2) and modify and supplement the

terms of the OEM Agreement with respect to particular client projects (Amendment Nos. 3 – 8).  The Mutual Confidentiality Agreement, OEM Agreement, Amendment Nos. 1-8 to the OEM Agreement, and related written agreements between the parties, such as project Statements of Work and any consulting agreements related to those Statements of Work, are referred to collectively as the "Agreements."

28.    To facilitate OX's development of its email interface product software under the OEM Agreement and provide OX with financial support for its ongoing operations, which OX was in desperate need of at the time, Openwave provided $ 1 million as an advance payment for certain OX software licenses.

29.    As indicated by the language in Section 12, of particular value to Openwave was the solutions software "OX Hosting Edition," which was to be jointly developed by Openwave and OX pursuant to the OEM Agreement and was defined in the OEM Agreement as follows:

> "OX Hosting Edition" means [OX's] email and collaboration solutions software, as further described on Exhibit A attached hereto, and which consists of OX Server, OX Web Access, OX Documentation and the OX Software and includes all bug fixes, enhancements, enhancements including those independent of a release designation number, modifications, updates, upgrades, new versions provided to Openwave and or the Openwave Customers hereunder.

30.    As part of the OEM Agreement, OX agreed that:

> Openwave retains all right, title and interest in and to the Openwave Products, and in any modifications, derivative works, extensions, plug-ins or the link, if any, of OX Hosting Edition developed for Openwave by [OX] or by Openwave on its own behalf pursuant to this [OEM] Agreement that relates to the Openwave Products and its management interface or GUI but to the extent that such modifications, derivative works, extensions and plugins are not integral to [OX's] core product code for the OX Hosting Edition.

31.    The effect of the Agreements, among other things, was that Openwave integrated and bundled certain software developed and modified under the OEM Agreement into Openwave's proprietary software and services that were then licensed to Openwave customers.

32.    The Agreements established a wide variety of additional obligations between the Parties, including those found in Section 12 of the OEM Agreement, which provides that:

> [OX] agrees that it will not engage in any transaction for the sale of OX Hosting Edition with any of the companies listed on Exhibit C.l attached hereto: provided, however, that [OX] shall not be prohibited from engaging with any company listed on Exhibit C.1 if such engagement (i) is solely for the OX Hosting Edition

7

COMPLAINT

and (ii) Openwave is actively selling the OX Hosting Edition based Richmail client as its primary webmail offering.

33.   Among other things, the OEM Agreement, and Section 12 of that Agreement, were intended to protect Openwave's trade secrets and other confidential business information from misappropriation.

34.   The further intent of the OEM Agreement was to cover future versions and updates to the relevant products.  New customers would be given the opportunity to receive the latest version of the products and existing customers would be provided the opportunity to purchase new versions and updates as they were completed.

35.   After consummating the Agreements, Openwave began constructing and marketing the new Openwave/OX email systems to a number of Openwave's existing and prospective customers.

36.   Beginning in 2011, with the effectuation of the OEM Agreement with Openwave, OX's software, referred to generically as "OX Hosting Edition" was further developed and designed to combine with Openwave's hardware and software systems.  The "OX" part was essentially the interface that an email user interacts with (sometimes referred to in the industry as the "front end"); the Openwave part was the email "engine" (sometimes referred to in the industry as the "back end") that combined with the "front end" to provide complete, robust email systems for large scale customers (with up to several million users on a particular company's system).  While negotiating its role in developing a user interface for Openwave's email product, OX continuously assured Openwave that it intended to serve as a willing and beneficial partner to Openwave in providing quality products and services to Openwave's customers.

37.   OX further represented it would act in Openwave's best interest and would take no actions to damage Openwave's reputation or misappropriate Openwave's products or trade secrets.

38.   Unfortunately, it would not be until recently that Openwave would discover that, even if OX entered into the Agreements with Openwave with honest intentions, at some point over the course of the companies' dealings OX began misrepresenting its actions and intentions, and taking unfair advantage of Openwave's trust and candor.

39.   For example, as alleged below, as early as October 2014, while purportedly in partnership with Openwave to develop and customize an email system for Openwave client Virgin

Media, OX was meeting surreptitiously with Openwave clients, including with Virgin Media, in an effort to undermine Openwave's business relationships with its clients, and in order to disguise technical problems with the OX technology by blaming Openwave's back end solution.

### Openwave's Partner Becomes Its Secret Competitor

40.     In March 2015, OX announced a merger with a company called Dovecot.  With the acquisition of Dovecot, OX put itself in a position to offer its existing front end product in combination with Dovecot's back end product to provide a complete customer solution.  In other words, in combination with Dovecot, OX could compete head-to-head with Openwave.

41.     Thereafter, OX began aggressively expanding its existing plan to unfairly and illegally use its contractual relationship with Openwave and access to Openwave's intellectual property and proprietary information to undermine customer confidence in Openwave, interfere with contracts and steal customers.

42.     OX misappropriated confidential and trade secret information regarding Openwave's products, customers, and personnel for the purpose of undermining Openwave's business relationships and reputation in the marketplace, with the ultimate goal of destroying Openwave as a competitor in the marketplace and taking all the resultant business for itself.

### OX Attempts to Damage Openwave by Stealing Customers and Making Damaging False Statements about Openwave and its Products

43.     After the acquisition of Dovecot, OX determined it no longer needed to partner with Openwave, however it knew it needed Openwave's customer relationships if it were to expand its business.

44.     Despite owing Openwave a duty of good faith and fair dealing, among other things, OX began actively undermining Openwave's client relationships, attempting to steal customers using Openwave's trade secrets, and commencing a calculated campaign to discredit, defame, and disparage Openwave and its products and services in the marketplace.

45.     In addition, OX began to disparage Openwave to Openwave's customers and potential customers, and made efforts to steal those customers by encouraging them to breach agreements with Openwave and use the newly-created OX suite of products instead, including the latest version of App

1  Suite.

2      46.    While OX has claimed that App Suite is an entirely "new" OX user interface product,

3  App Suite is in reality an updated version of its email interface, falling within the definition of "OX

4  Hosting Edition" contained in the OEM Agreement.  Further, more recent versions of App Suite, if not

5  all of them, contain the modified software developed jointly with and for Openwave, which belongs to

6  Openwave pursuant to the express terms of the OEM Agreement.  Despite this, OX has marketed and

7  continues to market these versions of App Suite as its own, in violation of the Agreements and without

8  a license from Openwave.  OX's misconduct has negatively impacted a number of Openwave's existing

9  clients across the globe and is damaging its relationships and business prospects with potential

10  customers.  A brief summary of the damage OX has caused to Openwave with respect to four

11  customers and potential customers is set forth below to illustrate the extent of OX's wrongful conduct.

12              ***1.   OX's Wrongful Conduct With Respect to Openwave Customer Virgin Media***

13      47.    One of Openwave's largest customers for whom Openwave was going to implement a

14  system containing the OX user interface was Virgin Media Limited ("Virgin Media"), a

15  telecommunications company headquartered in the United Kingdom.

16      48.    Virgin Media entered into an agreement with Openwave to purchase a new email system

17  in early 2013 entitled the "Framework Agreement for the Supply of a Fully Hosted and Managed

18  Replacement Email Service," (the "Virgin Framework Agreement"). Thereafter, Openwave began

19  working with OX immediately to develop and configure the customized email system that Virgin

20  Media desired.

21      49.    In order to provide products and services pursuant to its 2013 agreement with Virgin

22  Media, Openwave worked with OX through a series of Statement of Work orders ("SOWs") that

23  specified additional features and modifications to the email system requested by Virgin Media.  The

24  SOWs included changes to OX's App Suite product which, when combined with the other elements in

25  the Openwave email platform, were intended to provide a complete email solution for Virgin Media.

26      50.    As noted above, pursuant to the terms of the Agreements, the product revisions,

27  upgrades and modifications to the OX Hosting Edition made during the course of the Virgin Media

28  project, including App Suite, were the property of Openwave.

51.     While it purported to be working in partnership with Openwave on the project, OX falsely claimed that Openwave's back end had problems that were causing a delay in the project.   OX secretly told Virgin Media that OX could provide the email system Virgin Media wanted at a lower price, but only if Virgin terminated its contract with Openwave.

52.     On information and belief, to further conceal its activities in breach of its duties and obligations to Openwave under the OEM Agreement, OX told Virgin Media that OX could provide an email system to it only indirectly, *i.e.*, via a third-party.  OX failed to inform Openwave of any of these communications with Virgin Media, even as it was contractually obligated to work with Openwave in good faith to complete the Virgin Media project with Openwave.

53.     As a result of OX's material misrepresentations and omissions, and with OX's encouragement, Virgin Media terminated the Virgin Framework Agreement it had with Openwave in January of 2015, after nearly two years of development work had been completed on the project.  As a result of this termination, Openwave lost the benefits of a more than $20 million contract and incurred additional damages in the millions of dollars.  OX paid nothing to Openwave or to Virgin Media as a result of its failure to deliver on its obligations to Openwave and Virgin Media.  To the contrary, despite the fact that OX was paid significant sums of money by Openwave for the development of the App Suite product over the nearly two years that the companies worked together on the Virgin Media project, in 2015 OX also billed Virgin Media for licenses to its product – effectively receiving double payment by charging both Openwave and Virgin Media for the exact same licenses.

54.     As part of the cancellation of the Virgin Framework Agreement, Virgin Media represented to Openwave that Virgin Media would not use any part of Openwave's email platform solution or intellectual property in any replacement email system it adopted.  However, Openwave subsequently discovered that Virgin Media is in fact using OX's email interface App Suite – the same interface developed for the Openwave platform system – as part of its new email system.

55.     After some investigation, Openwave discovered that Virgin Media obtained its new email system via Ziggo Holdings, Virgin's sister company, owned by Virgin Media's parent company Liberty Global.  That new "Ziggo" email system uses OX's App Suite as its email interface front end, in combination with a system from Dovecot, the company purchased by OX, as the system's back end.

Openwave further learned that Virgin Media began using the "Ziggo solution" in early to mid-2015, less than six months after the termination of Virgin Media's agreement with Openwave in January 2015.

56.     This extremely short time frame between project kickoff and product launch is more than merely suspicious; to anyone who understands the amount of time and effort required to a design and launch an email system of that size and complexity it indicates two things:  first, that OX would have had to have commenced side discussions with Ziggo and/or Virgin Media during the time OX was going through the motions of performing under its contract with Openwave, during which time it owed Openwave duties of good faith and faith dealing, among other things; and second, the OX user interface that was implemented at Virgin Media must contain misappropriated Openwave intellectual property given that it was implemented with such lightning speed that there was insufficient time for independent development.

57.     Notably, Openwave's investigation has uncovered the fact that Ziggo implemented "Version 7.6.1 Rev 20" of the OX email interface on or about March 17, 2015.  Openwave is informed and believes that it was this same Version 7.6.1 Rev 20 that was subsequently implemented at Virgin Media just a few months later.  This Version 7.6.1 was the same version of the OX software that was developed as part of the Openwave/OX project for Virgin Media – the development for which OX was paid handsomely by Openwave.

58.     This identity of versions strongly suggests that OX implemented the OX Hosting Edition software version that was developed in conjunction with Openwave – and which belonged to Openwave – at Ziggo and at Virgin Media, just a few short months after Virgin Media terminated its agreement with Openwave.  Given the resources and costs expended developing the same software as part of the Openwave project, it would have been technically impossible for OX and Ziggo to have independently jointly designed, developed and implemented that advanced version of App Suite in such a short timeframe.  It appears that instead of going through that effort, OX merely took something that belonged to Openwave and sold it to Ziggo, and to Virgin Media through Ziggo.

59.     OX's actions to provide Openwave software and customized systems to Ziggo and to Virgin Media through Ziggo – software and customized systems that were paid for and owned by

Openwave – violates the terms of the OEM Agreement and that agreement's implied covenant of good faith and fair dealing.  It is also constitutes copyright infringement and a misappropriation of Openwave's trade secrets.  Further, the fact that OX contrived to provide an email solution to Virgin indirectly through Ziggo in an attempt to conceal its wrongdoing serves as evidence that it knew that what it was doing was wrongful, fraudulent and in direct breach of its obligations to Openwave.

60.     OX also knew or should have known that by its misconduct it was aiding and abetting Virgin Media in the breach of its contractual obligations to Openwave.

61.     As if that were not enough damage to inflict on Openwave, Openwave is additionally informed and believes that Ziggo and OX have become "partners," and are actively marketing email products covered by the Agreements to Openwave's customers and prospective customers, using the Dovecot email platform with OX's user interface – a user interface that contains Openwave's intellectual property.  Thus, OX's wrongful acts with respect to Ziggo and Virgin Media have very broad implications with respect to its scheme to wrongfully misappropriate Openwave's intellectual property to compete unfairly against Openwave in the marketplace.

## *2.   OX's Wrongful Conduct With Respect to Potential Openwave Customer A*

62.     Customer A, a UAE-based telecommunications provider, is a potential Openwave customer for email platform solutions.  Recently, Openwave pitched a solution to Customer A in conjunction with OX, a solution that would utilize the OX user interface.

63.     Openwave personnel learned that at the same time OX appeared to be working in cooperation with Openwave on the proposed Customer A deal, OX personnel were in fact also working behind the scenes to undermine Openwave's relationship with Customer A, to eliminate Openwave from the equation, and to take the Customer A deal for itself.  As part of its attempts to undermine Openwave to take the Customer A deal for itself, OX personnel falsely informed Customer A personnel that Openwave was in the process of closing its operations in Europe entirely, and was terminating large numbers of its employees such that it lacked the resources necessary to support the email system.

64.     OX's statements to Customer A personnel are demonstrably false, and evidence bad faith with respect to the OEM Agreement and provide further evidence OX's pattern and practice of unfair competition in the marketplace.  Yet again, OX was surreptitiously attempting to obtain a

customer as a direct client at the expense of Openwave, while it was concurrently acting as if it was engaged in a joint pitch with Openwave pursuant to the terms of the Agreements.  Such behavior is evidence of a willful intent to deceive Openwave and cause direct harm to its business.

65.     Ultimately, Openwave was able to close the deal with Customer A using its own user interface, however OX's wrongful conduct has caused substantial delay to the project and likely will expose Openwave to material monetary penalties.

### 3. *OX's Wrongful Conduct With Respect to Openwave Customer B*

66.     Customer B is a leading provider of telecommunications services in Europe.  Customer B is a long-term highly-valued customer of Openwave; Openwave and Customer B have worked together successfully for more than 16 years.  Prior to that time, Openwave had a long-standing business relationship with Customer B's predecessor.

67.     OX has targeted and hired numerous people from Openwave's Italy operations to staff OX's Italy operations that have been opened up in the exact same city.  The very same former Openwave salespersons now are actively using confidential Openwave information in an attempt to induce Openwave  customers to move business from Openwave to OX.

68.     For example, since he joined OX, Cristian Germani (a former Openwave employee who had frequent interaction with Customer B during his tenure at Openwave) has actively pursued Customer B as a potential customer on behalf of OX.  On information and belief, Mr. Germani and/or OX are using Openwave's trade secrets, particularly the contract pricing, contract terms, and system design details for Customer B, to aid OX in improperly competing with Openwave.

69.     According to documentary evidence, Mr. Germani has met with Customer B no less than three times since he joined OX, shortly after his departure from Openwave in June of 2015.

70.     In what is likely no coincidence, Customer B recently issued a letter to Openwave alleging a breach of contract.  That letter mirrored statements made by Virgin Media when it was in the process of terminating its agreement with Openwave, statements that appeared to be based on misrepresentations made to it by OX.  Notably, in its letter, Customer B identified a minor technical issue that had been remedied a very short time after the issue was discovered and reported to Openwave.  It seemed apparent that this minor technical issue raised in the letter merely served as a

pretext to obscure Customer B's discussions with Mr. Germani and OX.  Indeed, it is suspicious that the letter from Customer B was sent long after that minor issue had been resolved, yet very close in time to when Openwave learned that OX was attempting to replace Customer B's Openwave email system with its own.

71.     In sum, Mr. Germani and/or other OX personnel are using confidential and/or trade secret information obtained from Openwave, in an attempt to unfairly compete against Openwave with its longtime European customer.  Mr. Germani and/or other OX personnel are additionally making damaging false statements about Openwave and its products to Customer B in order to induce it to find a pretext to cancel its contractual agreement with Openwave, elect not to implement a new upgraded Openwave system, and implement an OX email solution instead.

### 4.     *OX's Wrongful Conduct With Respect to Openwave Customer C*

72.     Customer C is an Asia-Pacific headquartered cloud email security and cloud messaging platform provider.  Recently Openwave implemented a relatively small-scale email system for Customer C.  The email system Openwave implemented contained the OX user interface.  Openwave received prior authorization from the appropriate executive at OX to implement the proposed system for a company in the Asia-Pacific region before it proceeded with the implementation.

73.     In October 2015 OX informed Openwave that, contrary to the express authorization given by its employee, OX was taking the position that it had not given permission for Openwave to use the OX interface and that Openwave's implementation with Customer C constitutes an incurable, material breach of the OEM Agreement despite Openwave's offer to cure pursuant to the express terms of the OEM Agreement.

74.     In fact, Openwave has discovered that OX had secretly been in direct contact with Customer C since the summer of 2015, several months before the complained-of Openwave implementation took place.  Having failed to successfully compete directly with Openwave, it appears that OX is instead using the same playbook here as with Virgin Media and others, claiming a breach of the OEM Agreement and blocking Openwave's attempts to cure so that it could tar Openwave's reputation with Customer C, convince the customer to abandon its Openwave/OX email system, and to replace it with an OX email system using a different back end.

75.     OX yet again was taking underhanded secret actions for its own benefit, while pretending to work with Openwave as its business partner in seeking out and developing joint business opportunities, taking advantage of Openwave's efforts on its behalf on the one hand, while stabbing Openwave in the back with the other.  To make matters worse, OX expressly led Openwave to believe the licenses to the OX product were authorized and then used Openwave's reliance on OX's representations to allege a "material breach" of the OEM Agreement, thus giving Openwave a pretext to attempt to cancel **all** licenses granted to its interface under the OEM Agreement.  Openwave has tried to work out a solution to the dispute with OX, however, despite reaching an agreement in principle, OX has refused to execute a final agreement for the benefit of Customer C.

### OX's Fraudulent Proposed Merger

76.     Even while it was conducting its covert activities to disrupt Openwave's business relationships and existing contracts, in mid-2014, OX proposed to Openwave that the two companies should discuss a potential business combination.  The proposal contemplated either an acquisition of OX by Openwave, or an acquisition of Openwave by OX.

77.     As negotiations developed, OX asked for confidential information regarding the inner workings of Openwave, its business, marketing and sales strategies, corporate structure, and personnel.  Openwave reasonably believed at the time that OX sought this information in good faith for the purpose of genuine merger discussions.  Openwave explained to OX that it would provide the confidential information only because of OX's claimed genuine interest in a merger.

78.     However, it is now apparent that through those merger discussions OX again abused Openwave's good faith.  After obtaining Openwave's confidential information and trade secrets, OX proposed two offers which were absurd on their face:  one to purchase Openwave for less than one-third of its reasonable value; and another to sell OX to Openwave for more than six times OX's claimed revenues.

79.     It became clear that OX only made these offers as an attempt to cover up what now is clear was its true purpose in suggesting merger discussions:  to obtain as much confidential information regarding Openwave's operations, customers, and personnel as possible, with the goal of misappropriating Openwave's strategies, confidential pricing and product information, and ultimately

seeking to undermine and destroy Openwave's reputation so that OX could step into Openwave's shoes in the marketplace.

**_OX's Efforts To Steal Employees And Use Trade Secrets To Unfairly Compete With Openwave_**

80.    In addition to making material false statements about Openwave to its customers and potential customers in the marketplace, intentionally damaging Openwave's customer relationships, and misappropriating many of Openwave's trade secrets through fraudulent conduct, OX has also engaged in a concerted, worldwide effort to pursue Openwave's employees in the United States, Europe and the Asia Pacific Region and induce them to move to OX and to take confidential and proprietary information with them.

81.    Openwave's preliminary investigation into the movement of employees across the globe from Openwave to OX has disclosed some troubling facts.  Some of these former Openwave employees acted to misappropriate trade secrets and/or confidential and proprietary information from Openwave, including customer lists, pricing, and contract terms, to support OX in unfairly competing in several markets worldwide.

82.    To date, OX has induced no less than ten upper-level present and former Openwave employees to join OX.

83.    After soliciting these employees to join OX, OX began contacting various Openwave customers across Europe and using trade secret information, including pricing and contract terms, to unfairly compete against Openwave.  As an example, Mr. Germani, a former Openwave employee in Italy, has used his extensive knowledge of Openwave's products and pricing to unfairly solicit Openwave's longtime customers – the aforementioned Customer B and a Swiss company – on behalf of OX.

84.    As a result of OX's ongoing campaign, unfair competition, and willful violation of the Agreements, Openwave has suffered and continues to suffer significant harm.

85.    Paragraph 3.5 of the OEM Agreement required each party to comply with all applicable laws and regulations, avoid deceptive, misleading or unethical practices, and to conduct business in a manner that does not disparage the other party, its products, goodwill and reputation.  Openwave has

contacted OX on several occasions, demanding OX abide by the Agreements, cease its misappropriation and misuse of Openwave's trade secrets, and cease its malicious campaign to compete unfairly against Openwave in the marketplace.  Unfortunately, OX has refused to comply in any way, necessitating the instant action.

## COUNT I

### Copyright Infringement Under 17 U.S.C. § 101, *et seq.*

86.     Openwave repeats and re-alleges the allegations contained in paragraphs 1 to 85.

87.     Openwave is the owner of a copyrighted software program known as Open-Xchange App Suite Frontend 7.4.2-rev29 ("Openwave 29").  Openwave 29 is incorporated into App Suite.

88.     Openwave 29 is original and creative expression entitled to copyright protection.  An application to register the Openwave 29 was duly filed with the U.S. Copyright Office.

89.     OX has never sought, and Openwave has never granted to OX, any license to use or market the Openwave 29 outside the rights provided in the Agreements.

90.     By the actions complained of in this Complaint, OX has infringed and will continue to infringe Openwave's copyrights in the Openwave 29  by using and providing to third parties infringing copies of the software without Openwave's permission.

91.     OX has benefited from its infringement and from third party customers that it could not otherwise have serviced without its infringement.  Among other things, OX's infringement allowed it to unfairly compete for business that it could not otherwise have obtained on its own given how long it would have taken for OX to create, buy or license a noninfringing substitute for Openwave 29.

92.     In addition, Openwave has suffered and continues to suffer lost revenue from existing and potential customers.

93.     Openwave has suffered and continues to suffer an irreparable injury by OX's wrongful infringement of its copyrights, and no remedy available at law would be sufficient to compensate it for that injury.

94.     Considering the balance of the hardships between Openwave and OX, an injunction is warranted and the public interest would not be disserved by the issuance of an injunction.  As such, Openwave is entitled to a preliminary and permanent injunction restraining OX, and all persons acting

in concert with it, from engaging in further acts in violation of the Copyright Act.

95.     Openwave is further entitled to recover from OX OX's wrongful profits attributable to OX's infringement and, to the extent not duplicative, Openwave's lost revenue.

## COUNT II

### False Advertising in Violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)

96.     Openwave repeats and re-alleges the allegations contained in paragraphs 1 to 95.

97.     OX is selling, advertising, and promoting its products and services, as well as other products and services, in interstate commerce.

98.     By virtue of the conduct described above, OX has made false and misleading statements and misrepresentations of fact in commerce in press releases, interviews, in presentations to investors, in communications with customers and potential customers, and otherwise.

99.     OX's statements as described above, have a tendency to deceive and have deceived Openwave's customers and potential customers.

100.    OX's statements are material and have affected customers' decisions about whether to purchase Openwave's systems or services.

101.    OX's activities as set forth above constitute a violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

102.    On information and belief, OX has acted willfully, intentionally and in bad faith.

103.    Openwave has suffered and continues to suffer an irreparable injury by OX's wrongful acts of false advertising including a loss of goodwill, and no remedy available at law would be sufficient to compensate it for that injury.

104.    Considering the balance of the hardships between Openwave and OX, an injunction is warranted and the public interest would not be disserved by the issuance of an injunction.

105.    As such, Openwave is entitled to a preliminary and permanent injunction restraining OX, and all persons acting in concert with it, from engaging in further acts constituting false advertising in violation of the Lanham Act.

106.    Openwave is additionally entitled to actual damages in an amount to be proven at trial for injuries sustained as a result of OX's violations of 15 U.S.C. § 1125(a), recovery of OX's profits

obtained through its wrongful actions, as well as recovery of attorneys' fees and costs of this action.

107.    OX should additionally be required to issue corrective advertising to repair the damage it has done to Openwave with its customers and in the marketplace.

## COUNT III

## Misappropriation of Trade Secrets Under Cal. Code Civ. Proc. § 3426

108.    Openwave repeats and re-alleges the allegations contained in paragraphs 1 to 107.

109.    OX, through the conduct alleged above and through improper means, misappropriated trade secrets of Openwave, including, but not limited to, customer lists, pricing information, contract terms, software code, platform content and structure, and technical data and documentation.

110.    These various trade secrets are not generally known to the public or to others, including OX – beyond what OX learned under the protections of nondisclosure and confidentiality agreements in place between itself and Openwave – from which Openwave derives independent economic value.

111.    Openwave has engaged and continues to engage in efforts to maintain the secrecy of its trade secrets, including, but not limited to:  requiring employees, contractors and business partners to sign confidentiality and nondisclosure agreements; limiting access to its secrets within the organization through the use of password protection and other similar security measures.

112.    OX acquired Openwave's trade secrets through various misrepresentations, including representations made in connection with confidentiality and nondisclosure obligations in the Agreements.

113.    OX also acquired and used Openwave's trade secrets by inducing several of Openwave's employees to join OX and misuse or otherwise disclose Openwave trade secrets.

114.    OX knew or should have known that this information was acquired from persons who owed a duty to Openwave to maintain its secrecy.

115.    Openwave has suffered and continues to suffer an irreparable injury by OX's wrongful acts of theft of trade secrets, and no remedy available at law would be sufficient to compensate it for that injury.

116.    Considering the balance of the hardships between Openwave and OX, an injunction is warranted and the public interest would not be disserved by the issuance of an injunction.

117.     As such, Openwave is entitled to a preliminary and permanent injunction restraining OX, and all persons acting in concert with it, from engaging in further acts constituting misappropriation of trade secrets.

118.     Openwave is additionally entitled to actual damages for injuries sustained as a result of OX's wrongful actions in misappropriation and misuse of Openwave's trade secrets.

119.     As a further proximate result of OX's wrongful conduct, OX has been and will be unjustly enriched in an amount to be proven at trial.

120.     In the event that neither Openwave's actual damages nor OX's unjust enrichment are provable, Openwave is entitled to a reasonable royalty for using its trade secrets, as provided by Cal. Code Civ. Proc. § 3246.3(b).

121.     OX's misappropriation of Openwave's trade secrets was and is willful and malicious. Openwave is therefore entitled to exemplary or punitive damages pursuant to Cal. Code Civ. Proc. § 3426.3.  Openwave is further entitled to recover attorneys' fees and costs pursuant to Cal. Code Civ. Proc. § 3426.4.

## COUNT IV

## Breach of Contract

122.     Openwave repeats and re-alleges the allegations contained in paragraphs 1 to 121.

123.     Openwave and OX entered into a series of binding and enforceable agreements, collectively referred to as the Agreements.

124.     Openwave has performed all obligations and otherwise satisfied all conditions in the Agreement as to require performance by OX, except where its performance was excused.

125.     As set forth above, OX materially breached its obligations to Openwave imposed by the Agreements, breaches including but not limited to:  promises made in the OEM agreement to comply with laws and otherwise act fairly towards Openwave as detailed above, its promise to support Openwave and its customers as set forth in the applicable agreements, its promise not to disparage Openwave, its assignment of a license to, *inter alia*, any modifications, derivative works, extensions, plugins or the link, if any, of OX Hosting Edition, its promise not to actively solicit business with certain Openwave customers, and its promise to maintain the confidentiality of Openwave's

confidential and proprietary information, including but not limited to, Openwave's trade secrets.

126.    No event has occurred that excuses or otherwise absolves OX's failure to perform consistent with the terms of the Agreements.

127.    As a direct and proximate result of OX's breaches, Openwave has suffered damages in an amount to be proven at trial, including, but not limited to, Openwave's lost profits and consequential damages.

128.    Additionally, Openwave requests relief on the basis of quantum meruit for payments Openwave made to OX, including but not limited to, for payments made for the development of the App Suite product in connection with the Virgin Media project as detailed above.

## COUNT V

### Breach of the Implied Covenant of Good Faith and Fair Dealing

129.    Openwave repeats and re-alleges the allegations contained in paragraphs 1 to 128.

130.    Openwave and OX entered into a series of binding and enforceable agreements, collectively referred to as the Agreements.

131.    Implied as a matter of law in every contract is a covenant of good faith and fair dealing. This covenant required OX to act fairly and in good faith in negotiating and performing its duties and obligations under the Agreements.

132.    Openwave has performed all obligations and otherwise satisfied all conditions in the Agreements, except those obligations that were excused, as to require performance by OX.

133.    As set forth above, OX materially breached the implied covenant of good faith and fair dealing with regard to the Agreements through its misleading and fraudulent conduct, including, among other things:  misappropriating Openwave's trade secrets; taking for its own use without permission, Openwave's property protected by copyright that was obtained under the auspices of working with Openwave on joint system development and implementation projects; using confidential, proprietary and/or trade secret information in the possession of former Openwave employees it induced to join OX to assist OX with its plans to compete unfairly against Openwave; refusing to support and/or continue to license OX products and services as agreed under applicable contracts; making false and damaging statements to Openwave customers and potential customers in order to steal business from Openwave

based on those false representations; pretending to partner with Openwave on projects while secretly trying to take those contracts and potential contracts for its sole benefit; and otherwise engaging in acts to compete unfairly with Openwave in the marketplace.

134.   No event has occurred that excuses or otherwise absolves OX's failure to perform in good faith consistent with the intent of the Agreements.

135.   As a direct and proximate result of OX's breach, Openwave has suffered damages in an amount to be proven at trial, including, but not limited to, Openwave's lost profits and is further entitled to restitution and disgorgement of OX's wrongful profits.

## COUNT VI

## Tortious Interference With Contract

136.   Openwave repeats and re-alleges the allegations contained in paragraphs 1 to 135.

137.   Openwave has entered into binding and enforceable contracts with a number of customers, as described in detail above, including, among others, contracts with Virgin Media, Customer B and Customer C.

138.   At all relevant times, OX has had knowledge of the existence of these contracts as a result of, among other things, its knowledge of the contents of the OEM Agreement, communications between Openwave and OX over the course of their business dealings pursuant to nondisclosure and confidentiality agreements, and knowledge held by former Openwave employees subsequently employed by OX.  OX has interfered with and is intentionally interfering with these contracts by, among other things:  misappropriating Openwave's customer, pricing and system information; making false statements and claims with respect to Openwave, its products and personnel; making false statements and claims with respect to its own products and services in order to present proposals to those Openwave customers for an OX system to replace those customers' current Openwave email system, or pending implementation of an Openwave email system or system upgrade; and/or refusing to support and/or continue to license OX products and services as agreed under applicable contracts.

139.   OX has, by its wrongful conduct, induced a number of Openwave's customers to breach or cancel their contracts with Openwave, or to form the intention to do so.  Based on OX's actions, several of Openwave's customers, have actually breached and/or cancelled their respective agreements

with Openwave, including, among others, Virgin Media.

140.    OX's actions were wrongful in that they were expressly undertaken in an attempt to induce Openwave customers to breach or cancel their contracts with Openwave and become customers of OX at a time when OX and Openwave were working together performing the Agreements.  Upon information and belief, this interference has been accomplished with wrongful means including, but not limited to, OX making damaging material false statements regarding Openwave and its products, and the wrongful use of misappropriated trade secrets and infringing use of Openwave's copyrights, to convince customers of Openwave to violate the terms of their contracts with Openwave and/or cancel those contracts where they otherwise would not have done so.

141.    As a result of OX's actions, OX caused actual interference with Openwave's contracts and caused Openwave to be damaged in an amount to be determined at the time of trial.

142.    OX's acts were willful, malicious and oppressive, and were undertaken with the intent to cause harm to Openwave and Openwave's business relationships, and to destroy Openwave's business.  Therefore, Openwave is also entitled to an award of punitive damages to punish OX for its wrongful conduct and to deter it from engaging in similar wrongful conduct in the future.

## COUNT VII

### Tortious Interference With Prospective Business Relationships

143.    Openwave repeats and re-alleges the allegations contained in paragraphs 1 to 142.

144.    Openwave has developed business and economic relationships with a number of customers and prospective customers all of which contained a probability of future economic benefit to Openwave, including, but not limited to Virgin Media, and Customers A, B and C as alleged above.  Prospective customers also include current Openwave customers that are in the market for a system upgrade, including, but not limited to Customer B.

145.    At all relevant times, OX has known about these prospective economic relationships.  OX's knowledge of the existence of those prospective economic relationships was the result of, among other things, its knowledge of the contents of the OEM Agreement, communications between Openwave and OX over the course of their business dealings pursuant to nondisclosure and confidentiality agreements, and knowledge held by former Openwave employees later employed by

OX.

146.    OX is intentionally interfering with these prospective business relationships by, among other things, misappropriating Openwave's customer, pricing and system information; making false statements and claims with respect to Openwave, its products and personnel; and/or by making false statements and claims with respect to its own products and services in order to present proposals to those Openwave customers for an OX system to replace those customers' current Openwave email system, or pending implementation of an Openwave email system or system upgrade.

147.    OX's actions were wrongful in that they were expressly undertaken in an attempt to gain unfair advantage of the relationship with potential and existing Openwave customers and others with whom Openwave has established business relationships and sought to establish contractual relationships.  Upon information and belief, this interference has been accomplished by wrongful means including, but not limited to, the misuse of confidential or proprietary business information of Openwave, making damaging false statements to those prospective customers about Openwave's business and its products, and the use of misappropriated trade secrets and proprietary confidential business information as described above in an attempt to convince prospective clients not to do business with Openwave, but to do business with OX instead.

148.    As a result of OX's actions, OX caused actual interference with Openwave's economic relationships and prospective business relationships and caused Openwave to be damaged economically in an amount to be determined at the time of trial.

149.    OX's acts were willful, malicious, and oppressive and were undertaken with the intent to cause harm to Openwave and to destroy Openwave's business.  Therefore, Openwave is also entitled to an award of punitive damages to punish OX for its wrongful conduct and to deter it from engaging in similar misconduct in the future.

## COUNT VIII

### False Advertising (Cal. Bus. and Prof. Code § 17500)

150.    Openwave repeats and re-alleges the allegations contained in paragraphs 1 to 149.

151.    OX has made statements to present and potential Openwave customers, and to the public in general that are untrue and/or misleading regarding the capabilities and limitations of Openwave and

its products.  Those false and/or misleading statements include the following:  that Openwave was in the process of exiting the European marketplace, that Openwave was terminating large numbers of employees, and that Openwave lacked the resources to support its customer's needs.

152.    These untrue and misleading statements have deceived and are likely to deceive members of the public by leading them to believe that Openwave lacks the resources and commitment to support a customer's email system support needs over time, and therefore may cause that customer or potential customer to choose to disengage from or not to engage in business with Openwave and to engage in business with OX instead.

153.    OX knew or should have known that the false and misleading statements it made about Openwave's business and products were false when made.

154.    OX intended to induce reliance on the misrepresentations it made with those false and misleading statements because it intended to induce those Openwave customers and potential customers to lose faith in Openwave and its products, cancel and/or breach existing contracts with Openwave, or not enter into new contracts with Openwave, but to contract with OX for their email systems instead.

155.    Openwave has lost millions of dollars in actual and potential business as a result of OX's unfair competition and has suffered and continues to suffer irreparable injury and loss of reputation by OX's wrongful acts of false advertising, and no remedy available at law would be sufficient to compensate it for that injury.

156.    Considering the balance of the hardships between Openwave and OX, an injunction is warranted and the public interest would not be disserved by the issuance of an injunction.

157.    As such, Openwave is entitled to a preliminary and permanent injunction restraining OX, and all persons acting in concert with it, from engaging in further acts constituting false advertising as prohibited by California Business and Professions Code § 17500.

158.    Openwave is additionally entitled to damages in an amount to be proven at trial in restitution for the harm it has suffered as the result of OX's wrongful conduct.

## COUNT IX

### Unfair Competition Under Cal. Bus. & Prof. Code §§ 17200 *et seq.*

159.    Openwave repeats and re-alleges the allegations contained in paragraphs 1 to 158.

COMPLAINT

160.    As alleged above, OX has engaged in a campaign to actively solicit customers and prospective customers of Openwave.

161.    As one weapon in this campaign, OX has repeatedly made false statements about Openwave's reputation, the status of its business operations, the capabilities of its products, and its financial condition.  Specifically, OX falsely informed Openwave's customers and prospective customers that, among other things, Openwave was going out of business, that Openwave was exiting the European marketplace, was experiencing severe financial difficulties, and that Openwave was losing employees to such an extent that Openwave could no longer support customer needs and would fail as a company.

162.    OX has also repeatedly made false and derogatory statements regarding the capabilities of Openwave's products and services, including alleged issues that were directly caused by OX's own products and its personnel.  Specifically, OX falsely informed Openwave's customers and prospective customers that, among other things, Openwave's products were defective, could not meet customer specifications, and were the sole or primary cause of difficulties experienced by several customers that used, or planned to use, OX's product as its email user interface.

163.    Openwave has suffered and continues to suffer an irreparable injury and loss of reputation by OX's wrongful acts of unfair competition, and no remedy available at law would be sufficient to compensate it for that injury.

164.    Considering the balance of the hardships between Openwave and OX, an injunction is warranted and the public interest would not be disserved by the issuance of an injunction.

165.    As such, Openwave is entitled to a preliminary and permanent injunction restraining OX, and all persons acting in concert with it, from engaging in further acts constituting unfair competition as prohibited by California Business and Professions Code §§ 17200 *et seq.*

166.    Additionally, as a proximate result OX's unlawful, unfair, and/or fraudulent business acts and practices, Openwave has lost substantial money, and OX has enjoyed unlawful profits, in a sum not yet fully ascertained.  Openwave seeks the remedy of disgorgement and restitution for illicit profits obtained by OX.

## COUNT X

## Common Law Unfair Competition

167.     Openwave repeats and re-alleges the allegations contained in paragraphs 1 to 166.

168.     Openwave has made a substantial investment of time, skill and money over the course of nearly thirty years to develop its email platform products.

169.     As alleged above, OX has made false statements designed to harm Openwave's customer relationships and impugn Openwave's business and services, has targeted Openwave's salesforce worldwide in order to obtain confidential customer and strategic information, and has engaged in a campaign to unfairly misappropriate Openwave's intellectual property, know-how and email platform products at little or no cost to itself.

170.     That misappropriation and use of Openwave's property was done without Openwave's authorization or consent.

171.     OX has used and is using Openwave's property to appropriate Openwave's customers under false pretenses for its own commercial gain through the deceptive practices described above.

172.     OX's acts have caused damage to Openwave's goodwill and reputation and have caused pecuniary damage to Openwave in an amount to be proven at trial.

173.     Openwave is informed and believes and on this basis alleges that as a proximate and legal result of defendants' wrongful and/or unlawful conduct, OX has been unjustly enriched, including without limitation, by retaining the benefits of the misappropriation and unauthorized use of Openwave's property.

174.     Openwave is entitled to recover from defendants the gains, profits, advantages, and unjust enrichment OX has obtained as a result of its wrongful and/or unlawful acts.

175.     OX's conduct has injured Openwave in an amount to be proven at trial, and Openwave is entitled to damages to compensate it for that loss.

176.     OX's acts alleged above were willful, malicious, and oppressive; therefore Openwave is also entitled to an award of exemplary or punitive damages to punish OX for its wrongful conduct and to deter it from engaging in similar misconduct in the future.

## COUNT XI

## Fraud

177.    Openwave repeats and re-alleges the allegations contained in paragraphs 1 to 176.

178.    As set forth above, OX made certain false representations to and about Openwave during the course of the ongoing business relationship between the parties.  Among those false representations are:  that OX would abide by the terms of the Agreements entered into between the parties including agreements related to nondisclosure and confidentiality; that OX would serve as a willing partner to assist Openwave's operations and with the development and implementation of additional collaborative platform products; and that OX was engaging in merger discussions in good faith and would abide by the parties' confidentiality and nondisclosure agreements related to those negotiations.

179.    These statements were false when made because OX knew or should have known that its business plans, including its acquisition of Dovecot, would put it in direct competition with Openwave, and that it planned all along to use Openwave's proprietary information and business contacts to its own advantage and at the expense of Openwave and its business, while nonetheless purporting to partner with Openwave.

180.    Furthermore, as alleged above, OX expressly granted permission to Openwave for the use of the OX user interface in connection with a project for Customer C.  The project, while small, would have generated modest revenue for OX as well as for Openwave.

181.    It was only after Openwave had relied on OX's misrepresentation concerning permission to use its product for Customer C, that OX informed Openwave that it had not granted such license and would not grant a license to use its product in connection with Customer C.  Instead, OX communicated separately with Customer C and offered to provide a product to replace the already installed Openwave product.

182.    Not content with replacing Openwave, OX also claimed that the use of its software by Openwave constituted a "material breach" of the OEM Agreement and that, despite an express provision allowing a party to cure an alleged breach of the Agreement, Openwave would not be permitted to cure because the breach was allegedly "material" and thus could be cured.

183.    OX and its employees, agents and/or representatives made these and other

representations as alleged above, which they knew were false, with the intent to deceive and defraud Openwave, and to induce Openwave to act in reliance on those representations.

184.   As set forth in the allegations above, OX continued to act as if it was engaging in honest business dealings with Openwave to develop and implement email systems in partnership, OX was in actuality pursuing a secret agenda to gain access to Openwave's trade secret and confidential information for the twin purposes of enhancing its own email user interface using Openwave's hard-won know-how and directly undermining and damaging Openwave's client relationships so that it eventually could replace Openwave's products with its own.

185.   Openwave did, in fact, act in justifiable reliance on those misrepresentations, Openwave performed in good faith pursuant to the terms of the Agreements, shared confidential information with OX, and continued to expend efforts to sell new email systems utilizing OX's user interface.  Had it known the true facts, Openwave would not have continued to engage in business dealings with OX in that way or continued to share its confidential information and know-how with OX.  Openwave additionally would not have given OX access to Openwave's personnel, internal corporate structure, or various trade secrets and proprietary confidential business information in relation to merger discussions or otherwise.

186.   Openwave was damaged by these intentional misrepresentations in an amount to be proven at trial.

187.   OX's  conduct involved intentional misrepresentations, deceit and concealment of material facts known to OX undertaken with the intention of causing Openwave damage and injury, and was undertaken with malice and oppression, thereby justifying an award of exemplary and punitive damages against OX.

**PRAYER FOR RELIEF**

WHEREFORE, Openwave asks this Court to:

A.   Grant a preliminary and thereafter a permanent injunction restraining and enjoining OX and all those in privity, concert or participation with OX from:

(i)   infringing Openwave's copyrights;

(ii)   engaging in false advertising as prohibited by § 43(A) of the Lanham Act;

(iii)   misappropriating or otherwise improperly using Openwave's trade secrets; and

(iv)   engaging in false advertising as prohibited by California Business and Professions Code § 17200 *et seq.*

B.   Issue an order requiring OX, and all those in privity, concert or participation with OX who received actual notice of the order, to deliver up trade secret information currently in its, his, or her possession;

C.   Enter judgment in favor of Openwave against OX;

D.   Award Openwave actual, compensatory, and punitive damages;

E.   Award Openwave OX's profits attributable to OX's infringement of Openwave 29 and, to the extent not duplicative, Openwave's lost revenue;

F.   Award Openwave its costs, including attorneys' fees, pursuant to the Lanham Act, California Uniform Trade Secrets Act and as otherwise permitted by law.

G.   Enter such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38 and Civil Local Rule 3-6, Openwave hereby demands a jury trial.

Dated: January 14, 2016                    GREENBERG TRAURIG, LLP


By:  /s/ Ian C. Ballon
    Ian C. Ballon
    David M. Lisi
    Cathleen Donohoe

Attorneys for Plaintiff,
OPENWAVE MESSAGING, INC.