UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| OPENWAVE MESSAGING, INC.,<br><br>            Plaintiff,<br><br>    v.<br><br>OPEN-XCHANGE, INC.,<br><br>            Defendant. | Case No.  16-cv-00253-WHO<br><br>**ORDER DENYING MOTION TO DISMISS AMENDED COUNTERCLAIMS AND STRIKE AFFIRMATIVE DEFENSES**<br><br>Re: Dkt. No. 50 |

## INTRODUCTION

Plaintiff Openwave Messaging, Inc., moves to dismiss defendant Open-Xchange, Inc.'s amended Counterclaims 3 through 7 as insufficiently pleaded.   Opewave also moves to strike Counterclaim 1 as redundant, and Affirmative Defenses 9 and 15 through 18 as insufficiently pleaded.  Pursuant to Civil Local Rule 7-1(b), I determined the motion is appropriate for resolution without oral argument and vacated the hearing.  For the reasons set forth below, Openwave's motion is DENIED.

## BACKGROUND

### I.   FACTUAL BACKGROUND

Defendant and counterclaimant Open-Xchange, Inc. ("OX"), is a Delaware corporation and wholly-owned subsidiary of Open-Xchange AG, a German company.  Amended Counterclaims and Answer ("Am. Countercl.") (Dkt. No. 49) ¶ 8.[1]  OX "provides open-source commercial email software that customers integrate into their existing system's infrastructure." *Id.* ¶ 15.  OX is licensed by OX Software GmbH, another Open-Xchange AG subsidiary, to distribute Open-Xchange software in the United States, Canada, and South America.  *Id.* ¶ 8.

---

[1] The facts included are from the allegations in OX's Amended Counterclaims, unless stated otherwise.

United States District Court<br>Northern District of California

Plaintiff Openwave, Inc., is a Delaware corporation with its principal place of business in San Mateo, California. *Id.* ¶ 9. Openwave is a "provider of commercial email platform software and services for telecommunications carriers." *Id.*

## A. Openwave and OX's Business Relationship

In 2011, Openwave and OX began discussions to package OX's email interface, OX Hosting Edition, with Openwave's system. *Id.* ¶¶ 18-19. The parties entered into a "Mutual Confidentiality Agreement" in March 2011. *Id.* ¶ 21. In June 2011, the parties entered into a contract providing Openwave with a non-exclusive bulk license to OX Hosting Edition that Openwave could bundle with its own products, including Richmail, in exchange for a fixed payment to OX ("the OEM Agreement"). *Id.* ¶¶ 22-24. Openwave also paid ongoing license fees for any additional OX services that it sublicensed to its customers. *Id.* ¶ 23.

The OEM Agreement reserved OX's ownership rights in OX Hosting Edition and did not convey the copyright or ownership of any OX product to Openwave. *Id.* ¶ 26. Instead, "Openwave was to own only modifications to OX Hosting Edition developed for or by Openwave that (a) relate specifically to an Openwave product and its management interface or graphical user interface (GUI), and (b) are not integral to the core product code for OX Hosting Edition." *Id.* ¶ 26 (original emphasis removed). The OEM Agreement also included limited non-competition terms regarding specified customers that "required Openwave to be actively selling the OX Hosting Edition-based Richmail client as its primary webmail offering." *Id.* ¶ 29.

In 2012, the parties entered into a General Consulting Services Agreement for services to be performed by OX for Openwave. *Id.* ¶ 32. This agreement reserved OX's ownership rights in its "Contractor Property," including software programs and program code. *Id.* ¶¶ 32-33. It also provided Openwave with ownership rights in the "Deliverables," excluding any of OX's Contractor Property. *Id.* ¶ 33. OX retained an irrevocable license to the Deliverables. *Id.* ¶ 34.

## B. Development of App Suite

In 2013, OX released a commercial version of App Suite, "a modular platform that allows customers to selectively bundle a range of services and features such as email, messaging, office productivity and file sharing." *Id.* ¶ 35, 37. Open-Xchange GmbH developed App Suite and

Openwave was not involved.  *Id.* ¶ 35-36.  OX alleges that App Suite was a new product, and not a new version of OX Hosting Edition.  *Id.* ¶¶ 38, 41.  OX released App Suite version 7.4.2 in February 2014 and an updated version, 7.4.2-rev29, in December 2014.[2]  *Id.* ¶ 44.

Prior to its commercial release, OX told Openwave about App Suite.  *Id.* ¶ 38.  Openwave purchased App Suite licenses for specific Openwave customers from OX through several amendments to the OEM Agreement between December 2012 and June 2014.  *Id.* ¶¶ 42-43.  In June 2013, OX and Openwave executed Amendment No. 6, under which Openwave purchased licenses to sell App Suite to Virgin Media, a United Kingdom-based telecommunications provider.  *Id.* ¶¶ 45-46.  Openwave and Virgin Media then entered into an agreement relating to App Suite.  *Id.* ¶ 47.  The agreement contained a liquidated damages provision requiring payments to Virgin Media if Openwave did not fully implement Virgin Media's email platform by 2015.  *Id.* ¶ 48.

Openwave had OX create custom plugins for use with App Suite 7.4.2 that Openwave could implement for Virgin Media.  *Id.* ¶ 49.  These projects were put into seven Statements of Work, all governed by the General Consulting Services Agreement.  *Id.*  OX created the requested plugins, placed them in a repository accessible only by Openwave, and did not incorporate them into App Suite.  *Id.* ¶ 50.  OX provided several additional services for Openwave's implementation of App Suite for Virgin Media, but Openwave was unable to meet its deadlines and, in January 2015, Virgin Media terminated its contract with Openwave.  *Id.* ¶¶ 51, 53, 55-56.

### C.  Openwave's Alleged Competition with OX

Openwave went through a series of corporate reorganizations and ultimately merged with Critical Path, Inc.  *Id.* ¶¶ 57, 60-61.  Critical Path offered RichUI, a frontend solution that was competitive with OX Hosting Edition and, in part, App Suite.  *Id.* ¶ 60.  In 2014, OX discovered Openwave had been promoting RichUI instead of OX Hosting Edition or App Suite, despite the OEM Agreement's non-competition provision.  *Id.* ¶¶ 62-64.

---

[2] In contrast, Openwave alleges that App Suite is "an updated version of OX's email user interface, falling within the definition 'OX Hosting Edition' in the OEM Agreement."  SAC ¶ 64. Openwave further alleges that more recent versions of App Suite "contain the modified software developed for and by Openwave, which belongs to Openwave pursuant to the express terms of the OEM Agreement."  *Id.*  Additionally, Openwave alleges that it is the copyright owner of Open-Xchange App Suite Frontend 7.4.2-rev29, which is incorporated into App Suite.  SAC ¶ 79.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    That same year, Open-Xchange GmbH and Openwave submitted competing bids for a

2    contract with unidentified "Company O." *Id.* ¶ 71.  Openwave's then CEO sent to Company O's

3    senior management a letter with "disparaging statements about [Open-Xchange AG and its

4    subsidiaries'] financial capabilities, experience managing large projects, and alleged unreliability

5    of open source software and the open source approach." *Id.* ¶ 71 n.2.

6    **D.  Termination of the OEM Agreement**

7    In late 2015, OX learned that Openwave implemented App Suite and OX Drive for SMX

8    Ltd., a New Zealand company, and made App Suite available for download through servers

9    provided by Openwave. *Id.* ¶ 76.  OX did not grant Openwave a license to sell App Suite or OX

10   Drive to SMX, and Openwave did not make any payments to OX for this ability. *Id.*  OX

11   considered this a material breach and, in November 2015, gave notice to Openwave that it

12   intended to terminate the OEM Agreement. *Id.* ¶ 77.  On January 20, 2016, OX sent Openwave a

13   letter confirming the termination. *Id.*

14   The OEM Agreement specified that, upon its termination, Openwave would immediately

15   cease using any names, logos, trademarks, or identifier used by OX. *Id.* ¶ 83.  However, from the

16   OEM Agreement's termination until May 2016, Openwave continued to market and use "App

17   Suite," a common law trademark and identifier of OX, on its website and later on its acquirer

18   Synchronoss Technologies, Inc.'s website.[3] *Id.* ¶¶ 83, 85, 90. Openwave also falsely stated on its

19   website that App Suite is a product that Openwave is able to offer. *Id.* ¶ 88.  In addition,

20   Openwave continued to use OX's name and logo on Openwave's or Synchronoss's website,

21   stating that OX was a partner of Synchronoss. *Id.* ¶¶ 86-87.

22   Several customers informed OX that "Openwave's association with the App Suite name

23   has tarnished their impression of the App Suite product as a result of Openwave's notoriety for

24   poor services and performance." *Id.* ¶ 89.  Openwave's use of the App Suite and OX names on

25   Openwave's and Synchronoss's websites damaged OX's business reputation and resulted in lost

26   sales to OX. *Id.*

27

28   _____
     [3] Synchronoss acquired Openwave in March 2016.  Am. Counterclaim ¶ 92.

1   Sometime after Synchronoss acquired Openwave, an Openwave customer located in

2   Europe met with Openwave/Synchronoss representatives.  *Id.* ¶ 92.  The customer indicated it was

3   terminating its relationship with Openwave and switching to a different platform.  *Id.*  "In

4   response, senior leadership at Openwave/Synchronoss immediately began denigrating [OX], and

5   told the customer it had a 'worldwide' lawsuit against [OX] which would cause it to incur such

6   high costs that [OX] will go bankrupt."  *Id.*

7   **II.  PROCEDURAL BACKGROUND**

8   On January 14, 2016, Openwave filed a complaint against OX asserting eleven claims.

9   Complaint (Dkt. No. 1).  OX filed a motion to dismiss (Dkt. No. 18) that I granted in part, with

10  leave to amend (Dkt. No. 38).  Openwave subsequently filed two amended complaints, asserting

11  thirteen claims in its Second Amended Complaint ("SAC," Dkt. No. 42):  copyright infringement,

12  false advertising under the Lanham Act, misappropriation of trade secrets under federal and

13  California law, breach of contract and breach of the implied covenant of good faith and fair

14  dealing, tortious interference with contract and prospective business relationships, false

15  advertising and unfair business practices under California law, common law unfair competition,

16  fraud, and quantum meruit.  OX filed its counterclaims and answer (Dkt. No. 45), which

17  Openwave moved to dismiss (Dkt. No. 46).  In response, OX filed its Amended Counterclaims

18  and Answer, asserting affirmative defenses and seven counterclaims:  (1) declaratory judgment of

19  non-infringement of copyright; (2) declaratory judgment of invalidity of copyright; (3) breach of

20  covenant of good faith and fair dealing; (4) breach of contract; (5) false advertising under the

21  Lanham Act, 15 U.S.C. § 1125(a); (6) false advertising under California Business and Professions

22  Code §§ 17500, 17505 ("FAL"); and (7) unfair competition under California Business and

23  Professions Code § 17200 ("UCL").  Dkt. No. 49.  Openwave now moves to dismiss

24  Counterclaims 3 through 7, and to strike Counterclaim 1 and Affirmative Defenses 9 and 15

25  through 18.  Motion to Dismiss ("Mot.") (Dkt. No. 50).

26  **LEGAL STANDARD**

27  **I.  MOTION TO DISMISS**

28  In moving to dismiss counterclaims, "[t]he standards that apply to the complaint apply to

the counterclaims as well." *Heartland Payment Sys., Inc. v. Mercury Payment Sys., LLC*, No. 14-cv-0437-CW, 2016 WL 304764, at *2 (N.D. Cal. Jan. 26, 2016).  Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss if a claim fails to state a claim upon which relief can be granted.  To survive a Rule 12(b)(6) motion to dismiss, the claimant must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible when the plaintiff pleads facts that "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).  There must be "more than a sheer possibility that a defendant has acted unlawfully." *Id*.  While courts do not require "heightened fact pleading of specifics," a claim must be supported by facts sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 570.

Under Federal Rule of Civil Procedure 9(b), a party must "state with particularity the circumstances constituting fraud or mistake," including "the who, what, when, where, and how of the misconduct charged." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (internal quotation marks omitted).  However, "Rule 9(b) requires only that the circumstances of fraud be stated with particularity; other facts may be pleaded generally, or in accordance with Rule 8." *United States ex rel. Lee v. Corinthian Colls*., 655 F.3d 984, 992 (9th Cir. 2011).

In deciding a motion to dismiss for failure to state a claim, the court accepts all of the factual allegations as true and draws all reasonable inferences in favor of the plaintiff.  *Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987).  But the court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig*., 536 F.3d 1049, 1055 (9th Cir. 2008).

## II. MOTION TO STRIKE

Federal Rule of Civil Procedure 12(f) authorizes a court to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  Fed. R. Civ. P. 12(f).  The function of a motion to strike "is to avoid the expenditure of time and money that must arise from litigating spurious issues by dispensing with those issues prior to trial." *Sidney–Vinstein v. A.H. Robins Co*., 697 F.2d 880, 885 (9th Cir.1983).  Motions to strike are

1   generally disfavored and "should not be granted unless the matter to be stricken clearly could have

2   no possible bearing on the subject of the litigation." *Platte Anchor Bolt, Inc. v. IHI, Inc*., 352 F.

3   Supp. 2d 1048, 1057 (N.D. Cal. 2004). In addition, courts often require some showing of

4   prejudice by the moving party before granting a motion to strike. *Hernandez v. Dutch Goose, Inc.*,

5   No. C 13-03537 LB, 2013 WL 5781476, at *5 (N.D. Cal. Oct. 25, 2013).

6       "If the court is in doubt as to whether the challenged matter may raise an issue of fact or

7   law, the motion to strike should be denied, leaving an assessment of the sufficiency of the

8   allegations for adjudication on the merits." *Carolina Cas. Ins. Co. v. Oahu Air Conditioning

9   Serv., Inc*., 994 F. Supp. 2d 1082, 1090-91 (E.D. Cal. 2014). In resolving a motion to strike, I

10  view the pleadings in a light most favorable to the nonmoving party. *Platte Anchor Bolt*, 352 F.

11  Supp. 2d at 1057.

## DISCUSSION

## I.  MOTION TO DISMISS

14      Openwave moves to dismiss Counterclaims 5, 6, and 7 for lack of standing and

15  Counterclaims 3 through 7 for failure to meet the particularity requirement of Rule 9(b).

### A.  OX's Standing under the Lanham Act, FAL, and UCL

#### 1.  Lanham Act—Counterclaim 5

18      Counterclaim 5 for false advertising in violation of the Lanham Act alleges that, after the

19  OEM Agreement terminated, Openwave made a series of false and misleading statements online,

20  including using OX's logo, listing OX as a Synchronoss partner, and stating that Openwave offers

21  App Suite. Am. Countercl. ¶¶ 134-137. Openwave argues that the counterclaim should be

22  dismissed because OX failed to allege an injury sufficient to confer standing and OX's allegations

23  are conclusory and contradictory. Mot. at 8, 10.

24      Openwave asserts that OX failed to adequately plead that it suffered an injury proximately

25  caused by the alleged false and misleading statements. Mot. at 9. "To invoke the Lanham Act's

26  cause of action for false advertising, a plaintiff must plead (and ultimately prove) an injury to a

27  commercial interest in sales or business reputation proximately caused by the defendant's

28  misrepresentations." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1395

United States District Court
Northern District of California

(2014).  To demonstrate proximate cause, a party "ordinarily must show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising; and that that occurs when deception of consumers causes them to withhold trade from the plaintiff."  *Id.* at 1391.

OX alleges that Openwave's false and misleading statements caused lost sales and harm to its business reputation.  Am. Countercl. ¶ 144.  Regarding its reputation, OX alleges that:  (1) it "has been informed by several customers that Openwave's association with the App Suite name has tarnished their impression of the App Suite product as a result of Openwave's notoriety for poor services and performance"; and (2) the use of the App Suite and OX names on Openwave's and Synchronoss's websites after the termination of the OEM Agreement damaged OX's reputation.  *Id.*  Regarding lost sales, OX alleges that Openwave's use of the App Suite and OX names after termination of the OEM Agreement caused "potential customers to mistakenly turn to Openwave when seeking App Suite or [OX] products and services, and the sales or inquiries of [OX] or Openwave products resulting from this false advertising should rightly have gone to [OX]."  *Id.*

Openwave argues that these alleged injuries are conclusory and fail to demonstrate proximate cause because (i) "OX does not explain how Openwave's alleged use of the App Suite name or OX name on its website for three months, when the parties have been in business together for five years . . ., somehow resulted in concrete harm," (ii) OX does not allege that, "absent Openwave's alleged false and misleading statements, these unidentified potential customers would have bought OX's products and services," and (iii) OX does not allege that "these unidentified potential customers actually bought products or services from Openwave as a direct result of the alleged false and misleading statements."  Mot. at 9; Reply (Dkt. No. 54) at 5.  Because the allegations are conclusory, Openwave argues, I should disregard them and dismiss Counterclaim 5 for lack of standing.  Mot. at 9-10.

I disagree.  "[T]he proximate-cause requirement generally bars suits for alleged harm that is 'too remote' from the defendant's unlawful conduct."  *Lexmark*, 134 S. Ct. at 1390.  Here, OX alleges that it lost sales because of Openwave's use of the App Suite and OX names.  "[D]iversion

United States District Court
Northern District of California

8

of sales to a direct competitor may be the paradigmatic direct injury from false advertising." *Id.* at 1393.  OX also alleges that Openwave's use of the App Suite and OX names tarnished OX's reputation with several customers because of "Openwave's association with the App Suite name" and "notoriety for poor services and performance." Am. Countercl. ¶ 144.  Openwave argues that OX must plead the customers' names, the specific timeframes when they told OX their views were tarnished, and which specific individuals were present.  Reply at 4 n.6.  This is too granular at the pleading stage; discovery may provide these details.  OX's allegations sufficiently establish a plausible proximate causal relationship between Openwave's alleged conduct and OX's alleged injury.

Openwave also contends that Counterclaim 5 should be dismissed without leave to amend because OX's injury allegations, added in its Amended Counterclaims, contradict other allegations in both OX's original Counterclaims and Amended Counterclaims.  Mot. at 10.  Courts may dismiss a claim as not plausible where its supporting factual allegations are contradictory.  *See, e.g., Alatraqchi v. Uber Techs., Inc.*, No. C-13-03156 JSC, 2013 WL 4517756, at *5 (N.D. Cal. Aug. 22, 2013) (granting motion to dismiss claim for employment discrimination because the allegations were contradictory as to whether plaintiff was an employee or independent contractor); *Apple Inc. v. Psystar Corp.*, 586 F. Supp. 2d 1190, 1200 (N.D. Cal. 2008) (Alsup, J.) (granting motion to dismiss where antitrust claim did not plausibly allege an independent market because the allegations were internally contradictory).  A court may deny leave to amend where it would not be possible to amend "without contradicting any of the allegations of [the] original complaint." *Reddy v. Litton Indus., Inc.*, 912 F.2d 291, 296 (9th Cir. 1990).

First, Openwave asserts that OX's alleged injuries contradict allegations that OX's business has been successful generally and specifically against Openwave.[4]  Mot. at 10; Reply at 5; Am. Countercl. ¶ 4.  Not so.  It is possible for a corporation to suffer economic and reputational

---

[4] Openwave points to the allegation that "[OX's] business has been thriving.  Its share of the market has grown year over year, dramatically outpacing Openwave.  In competitive bids against Openwave, [OX] has won the business.  Other customers have come to [OX] after concluding that Openwave's products and services are inadequate."  Mot. at 10; Am. Countercl. ¶ 4.

United States District Court
Northern District of California

harm but continue to be successful overall.  And even if OX won competitive bids over Openwave or attracted some of Openwave's customers, that does not necessarily mean that OX did not lose sales or suffer reputational harm from Openwave's alleged use of the App Suite and OX names.

Second, Openwave argues that it is contradictory to allege that Openwave has a bad reputation and is failing in the market, yet is taking OX's customers.[5]  Reply at 6.  OX argues that Openwave "capitalized on [OX's] goodwill to try to boost its own reputation."  Opposition ("Oppo.")  (Dkt. No. 53) at 7.  Taking OX's allegations to be true—that it had a stronger reputation than Openwave—it is possible for Openwave to use the reputable App Suite and OX's names to attract OX's potential customers.  These allegations, therefore, are consistent.

While OX must ultimately prove its injuries, its allegations of reputational harm and lost sales proximately caused by Openwave's false statements are sufficient at the pleading stage.  Openwave's motion to dismiss Counterclaim 5 for lack of standing is DENIED.

### 2.  FAL and UCL—Counterclaims 6 and 7

Counterclaims 6 and 7 under the FAL and UCL are based on the same alleged conduct underlying Counterclaim 5:  after the OEM Agreement terminated, Openwave made false and misleading statements online, including using OX's logo, listing OX as a Synchronoss partner, and stating that Openwave offers App Suite.  Am. Countercl. ¶¶ 134-137, 147, 153.  Openwave argues that Counterclaims 6 and 7 should be dismissed because OX lacks standing under the FAL and UCL.[6]  Mot. at 11-12.

To demonstrate standing under the FAL and UCL, a party must "(1) establish a loss or deprivation of money or property sufficient to qualify as injury in fact, i.e., *economic injury*, and (2) show that that economic injury was the result of, i.e., *caused by*, the unfair business practice or false advertising that is the gravamen of the claim."  *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 322 (2011) (original emphasis).

---

[5] Openwave points to the following allegations:  "Openwave is not a strong competitor," and "Openwave has suffered the natural consequences of those failures in the market: unsatisfied, departing customers and flagging sales." Mot. at 10; Am. Countercl. ¶ 3.

[6] Openwave also asserts that OX's alleged injury of lost sales is conclusory and contradictory.  But as discussed above, OX this allegation is sufficiently pleaded.

United States District Court
Northern District of California

United States District Court
Northern District of California

Openwave argues that OX lacks standing to bring its FAL and UCL claims because it failed to plead causation. It asserts that OX does not sufficiently allege that "customers actually relied on the alleged false and misleading statements and that the purported false statements were an immediate cause of the alleged injury to OX." Mot. at 12. As an initial matter, the parties dispute whether the "actual reliance" requirement from consumer cases decided under the UCL post-Proposition 64 applies to a competitor case like this one.[7] Oppo. 9; Reply 7-9. However, even under Openwave's position—that OX must plead facts showing customers relied on its allegedly false representations—I find that OX has adequately alleged customer reliance.

Here, OX alleges that Openwave's continued use of the App Suite and OX names after the termination of the OEM Agreement "resulted in lost sales to [OX] by causing potential customers to mistakenly turn to Openwave when seeking App Suite or [OX] products and services." Am. Countercl. ¶ 89. OX similarly alleges it suffered harm "since prospective buyers drawn by Openwave's use of the App Suite and [OX] names made inquiries to and purchases from Openwave, rather than directly from [OX], under the mistaken belief that Openwave can offer [OX] products and services." *Id.* ¶ 149. These allegations plausibly demonstrate that customers actually relied on the alleged false statements.

Openwave's motion to dismiss Counterclaims 6 and 7 for lack of standing is DENIED.

## B. Particularity under Rule 9(b)—Counterclaims 3-7

Openwave also moves to dismiss for failure to meet the particularity requirement of Rule 9(b) the following: Counterclaim 3 for breach of covenant of good faith and fair dealing; Counterclaim 4 for breach of contract; Counterclaims 5 and 6 for false advertising under the Lanham Act and the FAL; and Counterclaim 7 for unfair competition under the UCL. Mot. at 13.

---

[7] In consumer cases, a plaintiff "must demonstrate actual reliance on the allegedly deceptive or misleading statements." *Kwikset Corp.*, 51 Cal. 4th at 326. "Consequently, a plaintiff must show that the misrepresentation was an immediate cause of the injury-producing conduct." *Id.* at 327. But a "plaintiff is not required to allege that [the challenged] misrepresentations were the sole or even the decisive cause of the injury-producing conduct." *Id.* (internal citations omitted; alteration in original).

### 1.  Applicability of Rule 9(b)

Rule 9(b) provides a heightened pleading standard for allegations of fraud.  OX does not dispute that the Lanham Act, FAL, and UCL claims are subject to Rule 9(b), but argues that it does not apply to Counterclaim 3 for breach of covenant of good faith and fair dealing and Counterclaim 4 for breach of contract.  Oppo. at 10.

Fraud is not an essential element for either Counterclaim 3 or 4.  "[I]n a case where fraud is not an essential element of a claim, only allegations ('averments') of fraudulent conduct must satisfy the heightened pleading requirements of Rule 9(b).  Allegations of non-fraudulent conduct need satisfy only the . . . pleading standards of Rule 8(a)."  *Vess*, 317 F.3d at 1105.  The question, therefore, is whether some portion of Counterclaims 3 and 4 either expressly allege "fraud" or allege "facts that necessarily constitute fraud (even if the word 'fraud' is not used)."[8]  *Id.*  In California, the elements of a cause of action for fraud are: "(a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage."  *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1126 (9th Cir. 2009) (citing *Engalla v. Permanente Med. Group, Inc.,* 15 Cal.4th 951, 974 (1997)) (original removed).

For its breach of the covenant of good faith and fair dealing claim, OX alleges that Openwave unfairly interfered with OX's rights to receive benefits under the OEM Agreement by promoting RichUI instead of OX Hosting Edition and disparaging OX.  Am. Countercl. ¶¶ 116, 117.  For instance, OX alleges that when Open-Xchange GmbH and Openwave submitted competing bids to unidentified "Company O" in 2014, Openwave's then CEO sent to Company O's senior management a letter that "concerned disparaging statements about [Open-Xchange AG

---

[8] OX points to *Ronpak, Inc. v. Electronics for Imaging, Inc.*, which held "[a] breach of contract claim falls outside the reach of Rule 9(b) because such a claim does not require intent to defraud, a false representation, or other elements of fraudulent misrepresentation."  No. 14-cv-4038-JST, 2015 WL 179560, at *4 (N.D. Cal. Jan. 14, 2015).  However, the same court in a later decision referred to *Ronpak*'s holding as a general statement and went on to find that a claim for relief for breach of contract and breach of the covenant of good faith and fair dealing did contain an averment of fraud that was subject to Rule 9(b).  *Steinberg v. Provident Funding Associates, L.P.*, No. 15-cv-3743-JST, 2016 WL 3361815, at *3 (N.D. Cal. June 17, 2016).  There is no brightline rule that Rule 9(b) does not apply to breach of contract claims. The focus is on the specific allegations supporting the claim.

and its subsidiaries'] financial capabilities, experience managing large projects, and alleged unreliability of open source software and the open source approach." Am. Countercl. ¶ 71 n.2. Neither the allegations that Openwave promoted a competitive product nor the allegations of disparaging statements "sound in fraud," and therefore Counterclaim 3 is not subject to Rule 9(b).

For its breach of contract claim, OX alleges that Openwave breached the OEM Agreement by: (i) selling App Suite and OX Drive to SMX, a New Zealand-based email provider, without a license from OX; (ii) continuing to market and use "App Suite" on its website after termination of the OEM Agreement; and (iii) continuing to use OX's name and logo on its website after termination of the OEM Agreement. Am. Countercl. ¶¶ 123-125, 129-130. The first alleged breach does not include allegations of misrepresentation to SMX or other fraudulent behavior. Therefore, the first allegation is not subject to Rule 9(b). The second and third allegations are repeatedly referred to as "false and misleading" statements later in the Amended Counterclaims and provide factual support for Counterclaims 5, 6, and 7. Therefore, these allegations are subject to Rule 9(b).

### 2. Sufficiency of Allegations

Under Rule 9(b), a party must "state with particularity the circumstances constituting fraud or mistake," including "the who, what, when, where, and how of the misconduct charged." *Vess*, 317 F.3d at 1106 (internal quotation marks omitted); *see also Frenzel v. AliphCom*, 76 F. Supp. 3d 999, 1005 (N.D. Cal. 2014) (*quoting In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1547-48 (9th Cir.1994), *superseded by statute on other grounds*) ( "[A] plaintiff must identify 'the time, place, and content of [the] alleged misrepresentation[s],' as well as the 'circumstances indicating falseness' or 'manner in which the representations at issue were false and misleading.'"). However, "Rule 9(b) requires only that the circumstances of fraud be stated with particularity; other facts may be pleaded generally, or in accordance with Rule 8." *Corinthian Colls*., 655 F.3d at 992. The purpose of Rule 9(b)'s heightened specificity requirement is "to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Swartz*, 476 F.3d at 764 (citation omitted).

United States District Court
Northern District of California

13

### a.   Counterclaims 5, 6, and 7—False Advertising and Unfair Competition

Openwave asserts that OX failed to meet the Rule 9(b)'s heightened pleadings standard for the Lanham Act, FAL, and UCL claims.  OX relies on the same set of facts to support all three of these counterclaims.  Therefore, it is appropriate to evaluate the sufficiency of the factual allegations for these counterclaims together.

OX alleges that from the OEM Agreement's termination until May 2016, Openwave continued to market and use "App Suite" on its website and later on Synchronoss's website.  Am. Countercl. ¶¶ 83, 85, 90.  Openwave also allegedly continued to use OX's name and logo on Openwave's or Synchronoss's website, stating that OX was a partner of Synchronoss.  *Id.* ¶¶ 86-87.  OX attached screenshots of the alleged statements as exhibits to its Amended Counterclaims.  *Id.*, Exs. A, B.  These statements are alleged to be false and misleading because the OEM Agreement specified that, upon its termination, Openwave would immediately cease using any of OX's names, logos, trademarks, or identifiers.  *Id.* ¶ 83.

The purpose behind Rule 9(b) has been satisfied here.  Openwave has been given sufficient information on "what" the alleged false statements were, "when" the statements were given, "who" made the statements, and "where" the statements took place.  Openwave, therefore, has sufficient notice "of the particular misconduct which is alleged to constitute the fraud charged so that [it] can defend against the charge."  *Swartz*, 476 F.3d at 764 (citation omitted).

Openwave points to four allegations relevant to Counterclaims 5, 6, and 7 that it argues are insufficient under Rule 9(b).[9]  However, all four relate to OX's allegations of injury.  As discussed above, OX has sufficiently pleaded plausible injuries for its Lanham Act, FAL, and UCL claims.  Moreover, OX notes that it cannot plead more specific facts regarding its injury because "whether 'potential customers actually bought products or services from Openwave as a direct result of the alleged false and misleading statements' are facts that are uniquely in the possession of Openwave and those third parties."  Oppo. at 5.

---

[9] Openwave lists 14 allegations related to several different counterclaims that it argues are insufficient under Rule 9(b).  However, only the last four are relevant to Counterclaims 5, 6, and 7.  *See* Mot. at 14-16.

1   Openwave's motion to dismiss Counterclaims 5, 6, and 7 for failure to meet the Rule 9(b)

2   particularity standard is DENIED.

3   **b.   Counterclaims 3 and 4—Breach of Covenant of Good Faith and Fair**

4   **Dealing and Breach of Contract**

5   To the extent that OX relies on averments of fraud to support Counterclaim 4 for breach of

6   contract, its "allegations should be 'disregarded' or 'stripped from the claim'" if they fail to satisfy

7   Rule 9(b). *Vess*, 317 F.3d at 1105 (internal citations omitted). However, as with Counterclaims 5,

8   6, and 7, the allegations regarding Openwave's continued use of the App Suite and OX names

9   after the termination of the OEM Agreement are sufficiently alleged to meet Rule 9(b) for its

10   breach of the contract counterclaim.

11   Openwave further argues that even if Rule 9(b) does not apply, Counterclaims 3 and 4 are

12   still insufficiently pleaded because they "rest entirely on 'threadbare recitals of the elements of a

13   cause of action, supported by mere conclusory statements." Mot. at 17. Openwave refers back to

14   the list of 14 allegations from various parts of the Amended Counterclaims that it argued were

15   insufficiently pleaded under Rule 9(b) as also insufficient under Rule 8(a). Reply at 11.

16   "The implied covenant of good faith and fair dealing 'imposes upon each party [to a

17   contract] a duty of good faith and fair dealing in its performance and its enforcement." *Ronpak*,

18   2015 WL 179560, at *5 (citing *McClain v. Octagon Plaza, LLC*, 159 Cal. App. 4th 784, 798

19   (2008)). "The duty is meant to ensure that neither party will do anything that would 'injure the

20   right of the other to receive the benefits of the agreement.'" *Id.* (citing *Wolf v. Walt Disney*

21   *Pictures & Television*, 162 Cal. App. 4th 1107, 1120 (2008)). But a claim for breach of the

22   covenant of good faith and fair dealing may not "impose substantive duties or limits on the

23   contracting parties beyond those incorporated in the specific terms of their agreement." *Agosta v.*

24   *Astor*, 120 Cal. App. 4th 596, 607 (2004) (internal quotation marks omitted).

25   OX alleges that the OEM Agreement implies "a promise that . . . the parties will not

26   unfairly interfere with the right of the other party to receive benefits." Am. Countercl. ¶ 113. OX

27   further alleges that Openwave unfairly interfered with this right by promoting RichUI, a

28   competing product, over OX Hosting Edition to Softbank and three other companies. *Id.* ¶¶ 63,

United States District Court
Northern District of California

15

65, 116.  Additionally, OX alleges that Openwave disparaged OX, for example, to a company for which Openwave and an OX affiliate company had submitted competing bids.  *Id.* ¶¶ 71, 117.  As a result of this conduct, OX alleged that it incurred damages including "the lost benefit of work that it performed to secure customers for Openwave and license payments for the customers who switched to RichUI."  *Id.* ¶ 119.  These allegations support a plausible claim for breach of the covenant of good faith and fair dealing.

To establish breach of contract, a party must demonstrate the following elements: "(1) the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to plaintiff."  *Careau & Co. v. Sec. Pac. Bus. Credit, Inc.*, 22 Cal. App. 3d 1371, 1388 (1990).  OX alleges the parties entered into the OEM Agreement.  Am. Countercl. ¶ 121.  It alleges that it performed all its duties under the agreement, including providing support on the Openwave-Virgin Media project in connection with Amendment No. 6. *Id.* ¶¶ 50, 51, 122.  It alleges that Openwave breached the agreement in three ways: (i) selling App Suite and OX Drive to SMX without a license from OX; (ii) continuing to market and use "App Suite" on its website after termination of the OEM Agreement; and (iii) continuing to use OX's name and logo on its website after termination of the OEM Agreement.  *Id.* ¶¶ 123-125, 129-130.  And, it alleges that it suffered damages, including loss of its good will and reputation, and lost sales or profits.  *Id.* at 131.  These plausible allegations support the claim for breach of contract.

Openwave's motion to dismiss Counterclaims 3 and 4 for failure to state a claim is DENIED.

## II.  MOTION TO STRIKE

### A.  Counterclaim 1 for Declaratory Relief

Openwave argues I should strike with prejudice OX's first amended counterclaim for declaratory relief of non-infringement as redundant of OX's affirmative defenses and denial of liability.  Mot. at 7.  A court "has complete discretion whether to hear a counterclaim for declaratory judgment."  *Stickrath v. Globalstar, Inc.*, No. 07-cv-1941-TEH, 2008 WL 2050990, at *3 (N.D. Cal. May 13, 2008).  "Numerous courts have used that discretion to dismiss counterclaims under [Rule] 12(f) where they are either the 'mirror image' of claims in the

16

United States District Court
Northern District of California

complaint or redundant of affirmative defenses." *Id.* But "it is not always appropriate to strike declaratory judgment counterclaims simply because they concern the same subject matter or arise from the same transaction as the complaint." *Id.* at *4. In deciding whether to strike a declaratory judgment counterclaim, a "court should focus on whether the counterclaims serve any useful purpose and should dismiss or strike a redundant counterclaim only when it is clear that there is a complete identity of factual and legal issues between the complaint and the counterclaim." *Id.* (internal citations and quotation marks omitted). In addition, courts often require some showing of prejudice by the moving party. *Hernandez*, 2013 WL 5781476, at *5.

Counterclaim 1 seeks a declaratory judgment that OX "has not infringed any copyright Openwave claims to hold as to Open-Xchange App Suite Frontend 7.4.2-rev29." Am. Countercl. ¶ 102. It alleges that: (i) OX is the owner of the right to distribute and license App Suite; (ii) OX Software GmbH owns all intellectual property rights in App Suite; and (iii) even if Openwave acquired ownership rights in App Suite 7.4.2-rev 29, OX would have a license to it under the parties' agreements. *Id.* ¶¶ 94-98.

In comparison, Openwave's first claim alleges that it is the copyright owner of App Suite Frontend 7.4.2-rev29 ("Openwave 29") and that OX has infringed this copyright. SAC ¶¶ 79, 132, 134-144. OX's first affirmative defense states, "Openwave's copyright claim is barred, in whole or in part, by its lack of ownership of the alleged copyrights asserted, as described more fully in [OX's] counterclaims[.]" Am. Countercl. at 46. OX's second affirmative defense states, "Openwave's copyright claim is barred, in whole or in part, because Openwave granted [OX] a perpetual license to any works it developed for Openwave, as stated in the parties' General Consulting Services Agreement." *Id.*

The parties disagree on whether Counterclaim 1 "serve[s] any useful purpose." *See Stickrath*, 2008 WL 2050990, at *4. OX argues Counterclaim 1 will resolve uncertainty that resulted from this lawsuit, "which has caused [OX's] actual and prospective customers to express concern about Openwave's claimed interest in App Suite and what it means for them." Oppo. at 4. OX also asserts that Counterclaim 1 "lays the foundation for an early motion for summary judgment motion on the straightforward, threshold issue of ownership," and that Openwave would

United States District Court
Northern District of California

1    not suffer any prejudice from the counterclaim.  *Id.*  Openwave argues that Counterclaim 1 only

2    denies Openwave's first claim and reiterates OX's affirmative defenses, adding nothing to this

3    action.  MTD at 7, Reply at 1.

4        Although it is unclear to me whether Conterclaim 1 serves any useful purpose, Openwave

5    has not identified any prejudice that it would suffer if this counterclaim is not struck.  This case is

6    still in its early stages.  Lacking any harm to Openwave, I will not strike Counterclaim 1 at this

7    time.

8        **B.  Affirmative Defenses 9 and 15-18**

9        Openwave argues that Affirmative Defenses 9 and 15 through 18 should be struck as

10   insufficiently pleaded.  As a threshold matter, the parties disagree on whether the *Twombly/Iqbal*

11   standard or a lower "fair notice" standard applies to affirmative defenses.  I have previously

12   agreed with my colleagues in this district that the *Twombly/Iqbal* standard applies to affirmative

13   defenses.  *See BlackBerry Ltd. v. Typo Prod. LLC*, No. 14-cv-00023-WHO, 2014 WL 1867009, at

14   *4-5 (N.D. Cal. May 8, 2014).

15   However, the Ninth Circuit subsequently decided *Kohler v. Flava Enterprises, Inc.*, 779

16   F.3d 1016 (9th Cir. 2015).  *Kohler* affirmed a district court's finding that an affirmative defense

17   was adequately pleaded, stating, "the 'fair notice' required by the pleading standards only requires

18   describing the defense in 'general terms.'"  *Id.* at 1019.  OX points to an Eastern District of

19   California decision that construed *Kohler* as holding that the "fair notice" standard, rather than

20   *Twombly-Iqbal*, applies to affirmative defenses.  *See Castellano v. Access Premier Realty7, Inc.*,

21   No. 15-cv-0407, 2015 WL 7423821, at *2 (E.D. Cal. Nov. 23, 2015).  In fact, every Eastern

22   District of California court to evaluate the pleading standard for affirmative defenses in light of

23   *Kohler* has found that the fair notice standard applies.  *Bcompany v. Courtesy Oldsmobile-*

24   *Cadillac, Inc.*, No. 15-cv-01137, 2016 WL 615335, at *3 (E.D. Cal. Feb. 16, 2016) (collecting

25   cases).  Only two decisions in this district have discussed *Kohler*.  The first found that *Kohler* "did

26   not specifically hold . . . that the *Twombly/Iqbal* standard does not apply to the pleading of

27   affirmative defenses."  *Perez v. Wells Fargo & Company*, No. 14-cv-0989-PJH, 2015 WL

28   5567746, at *3 (N.D. Cal. Sept. 21, 2015).  In the second, the court declined to decide whether the

*Twombly/Iqbal* standard continues to apply after *Kohler* because the defendant's affirmative defenses were insufficient even under the "fair notice" standard. *Barrilleaux v. Mendocino Cty.*, No. 14-cv-01373-TEH, 2016 WL 1298860, at *2 (N.D. Cal. Apr. 4, 2016).

I need not decide which standard should apply after *Kohler* because, as discussed below, OX's affirmative defenses are sufficiently pleaded even under the more demanding *Twombly/Iqbal* standard. Under this standard, "a defense need not include extensive factual allegations," but "bare statements reciting mere legal conclusions may not be sufficient." *Perez v. Gordon & Wong Law Grp., P.C.*, No. 11-cv-03323-LHK, 2012 WL 1029425, at *8 (N.D. Cal. Mar. 26, 2012). "In other words, the simple listing of 'a series of conclusory statements asserting the existence of an affirmative defense without stating a reason why that affirmative defense might exist' is not sufficient." *Hernandez*, 2013 WL 5781476, at *4.

### 1. Affirmative Defense 9—Waiver and Estoppel

OX's Affirmative Defense 9 for waiver and estoppel is:

> Openwave's claims are barred by the doctrines of waiver and estoppel, including without limitation because Openwave replaced [OX's] front end products with its own products after the acquisition of Critical Path, and because Openwave has conducted itself and entered into agreements acknowledging that it does not own the copyrighted works at issue. The OEM Agreement and related agreements state that OX Hosting Edition is the property of [OX], and state that [OX] retains ownership of any copyright that comprises the core of its products. As alleged more fully in [OX's] counterclaims, Openwave has represented to its customers and to [OX] that it recognizes that App Suite is a new product and not an updated version of OX Hosting Edition; Openwave has acknowledged that it needed to either amend the OEM Agreement or enter into a new agreement in order to distribute App Suite; and Openwave has acknowledged that it had a limited number of seat licenses for OX Hosting Edition, which would not be the case if Openwave actually owned OX Hosting Edition.

Am. Countercl. at 48.

Openwave argues that this affirmative defense should be struck because OX has not alleged that "Openwave intended to waive its rights or had the necessary intent under the doctrines of waiver and estoppel." Mot. at 18. OX replies it has provided detailed factual allegations that Openwave "widely represented that it does not own a copyright in App Suit and that it has no right to distribute App Suite under the OEM Agreement except by amendment" in support of its defense

United States District Court
Northern District of California

that Openwave "waived any claim to the contrary and should be estopped from pursuing such claims." Oppo. at 13.

"Waiver is the intentional relinquishment of a known right with knowledge of its existence and the intent to relinquish it." *Catch a Wave, Inc. v. Sirius XM Radio, Inc.*, No. C 12-05791 WHA, 2013 WL 1996134, at *2 (N.D. Cal. May 13, 2013) (striking affirmative defense for waiver under *Twombly/Iqbal* standard for failure "to explain how or when plaintiff intentionally relinquished any known right"). Estoppel requires four elements: "(1) the party to be estopped must know the facts; (2) he must intend that his conduct shall be acted on or must so act that the part asserting the estoppel has a right to believe it is so intended; (3) the latter must be ignorant of the true facts; and (4) he must rely on the former's conduct to his injury." *Id.* at *3. Here, OX alleged ample facts that plausibly support OX's position that Openwave's behavior amounts to an admission or, at least, an indication that Openwave did not own a copyright in App Suite. Openwave's motion to strike Affirmative Defense 9 is DENIED.

**2. Affirmative Defenses 15 and 16—Disclosure and Trade Secrets Known or Readily Ascertainable**

OX's Affirmative Defense 15 for disclosure is:

> Openwave's claims for trade secret misappropriation are barred, in whole or in part, because it disclosed the purported trade secrets without any conditions of confidentiality. This includes disclosure of its purported trade secrets to [OX], to Openwave's customers, and to the public, without any conditions of confidentiality.

Am. Countercl. at 50. OX's Affirmative Defense 16 for alleged trade secrets known or readily ascertainable states:

> Openwave's claims for trade secret misappropriation are barred, in whole or in part, because its alleged trade secrets are known or readily ascertainable by the relevant industry and/or by persons who could obtain economic value, if any, from their information and were in the public domain. This includes customer information and information about Openwave products, which are subjects of discussion by Openwave's customers and potential customers and other individuals and entities who participate in the market for Openwave and [OX's] products and services.

*Id.* at 50.

Openwave argues that these affirmative defenses are insufficient because OX failed to

United States District Court
Northern District of California

allege "the circumstances surrounding Openwave's disclosure of its trade secrets 'without any conditions of confidentiality' including . . . when, where and how such trade secrets were disclosed and by whom and to whom." Mot. at 19.  OX contends that Openwave has not cited any authority justifying application of Rule 9(b) to affirmative defenses.  Oppo. at 14.  For pleading purposes, OX has stated enough, and the motion to strike is DENIED.

### 3.   Affirmative Defense 17—No Improper Means

OX's Affirmative Defense 17 for no improper means is:

> Openwave's claims for trade secret misappropriation are barred, in whole or in part, because [OX] did not obtain any purported trade secrets by improper means.

Am. Countercl. at 51.

Openwave argues that this affirmative defense is insufficient because Openwave "did not allege that OX obtained Openwave's trade secrets *solely* through improper means" and that it is "immaterial whether OX obtained the trade secrets through proper or improper means as the unauthorized **use** of the trade secrets, regardless of how obtained, is prohibited." Mot. at 20, Reply at 14 (original emphasis).  OX responds that I should not strike the affirmative defense because OX "*may in fact* have initially obtained purported trade secrets through a proper means and then misused them." Oppo. at 14 (original emphasis).

It is not clear whether the manner in which OX obtained Openwave's trade secrets or OX's use of the same will matter to Openwave's trade secret misappropriation claims.  Where there is any "doubt as to whether the challenged matter may raise an issue of fact or law, the motion to strike should be denied, leaving an assessment of the sufficiency of the allegations for adjudication on the merits." *See Carolina Cas. Ins. Co*, 994 F. Supp. 2d at 1090-91.  The motion to strike Affirmative Defense 17 is DENIED.

### 4.   Affirmative Defense 18—Wrong Party

OX's Affirmative Defense 18 for wrong party is:

> Openwave's claims for false advertising, trade secret misappropriation, tortious interference, unfair competition, and fraud (Counts II–IV and VII–XII) are barred, in whole or in part, because it has sued the wrong party. Many of its allegations pertain to actions Openwave asserts to have occurred outside of the

> Americas, and therefore these actions were not and could not have been performed by [OX], which only operates in North America, Central America, and South America. The geographic nature of Openwave's allegations suggest that these claims are more properly asserted against one or more of the European Open-Xchange entities, such as Open-Xchange AG, Open-Xchange GmbH, or Open-Xchange Srl.

Am. Countercl. at 51.

Openwave argues that this affirmative defense is insufficient because OX did not "identify specifically which entity or entities were responsible for which alleged acts or omissions." Mot. at 21. However, OX has sufficiently pleaded that it only operates in North and South America and is, therefore, the wrong party to sue for conduct outside of that area. OX's affirmative defense suggests, without disclosing, which entities might be responsible. Openwave cites no case law that would require OX to plead more. The motion to strike Affirmative Defense 18 is DENIED.

CONCLUSION

For the reasons set forth above, the motion to dismiss Counterclaims 3 through 7, to strike Counterclaim 1 and to strike Affirmative Defenses 9 and 15 through 18 is DENIED.

**IT IS SO ORDERED**.

Dated: October 28, 2016



WILLIAM H. ORRICK
United States District Judge